**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Younglove Construction, LLC,                           Case No. 3:08CV1447

        Plaintiff

   v.                                                                  ORDER

PSD Development, LLC, et al.,

        Defendants

This suit arises out of a "design/build" construction contract for a feed mill. Plaintiff Younglove Construction, LLC, (Younglove), an Iowa company, asserts that defendant PSD Development, LLC, (PSD Development), an Ohio company, has withheld $1,136,496 in payments in violation of their contract. Younglove also alleges that PSD Partners, LLC, PSD Leasing, LLC, and Kalmbach Feeds, Inc., cannot counterclaim against Younglove because none of these entities were intended third-party beneficiaries of the contract. Jurisdiction is proper under 28 U.S.C. § 1332.

Pending is Younglove's motion for summary judgment on its breach of contract claim and on the on the breach of contract and breach of warranty claims asserted against it by PSD Partners, PSD Leasing, LLC, and Kalmbach Feeds, Inc. [Doc. 97]. For the following reasons, the motion is granted in part and denied in part.

**Background**

PSD Development contracted with Younglove to build and design a new animal feed manufacturing plant (feed mill) on property PSD Development owned in Wyandot County, Ohio.

The contract consisted of six main parts: 1) the Agreement; 2) General Conditions; 3) Supplementary Conditions; 4) the Design/Build Manual; 5) the Design/Builder's Proposal, Specifications, and Project Schedule; and 6) Additional Supplementary Conditions. [Doc. 111, App. A-1]. The contract also incorporated by reference the following: 1) Notice to Proceed; 2) all work change directives and change orders amending, modifying or supplementing the contract, pursuant to paragraph 3.04.A of the General Conditions; 3) specifications for the feed mill prepared by or for Design/Builder and approved by Owner; and 4) drawings showing the scope, extent or character of the feed mill, prepared by or for Design/Builder and approved by Owner. *Id.* at 6-7.

In the contract, "Design/Builder" refers to Younglove and "Owner" refers to PSD Development. Although the contract contains references to Kalmbach Feeds, Inc., the Additional Supplementary Conditions make clear that "[t]his contract is between PSD Development L.L.C. and Younglove Construction L.L.C. Wherever 'Kalmbach Feeds, Inc.' is noted in this contract, it is to be replaced with PSD Development L.L.C." [Doc. 111, App. A-1, at 101]. The contract mentions no other parties. Ohio law governs the contract.

The contract gave a start date of not later than August 1, 2006, and required substantial completion within fifteen months. The parties agree that the feed mill was substantially completed on time, but both parties allege the other failed to perform its contractual obligations.

### 1. Concrete Strength

Problems surfaced soon after the construction of the main mill tower began in mid-November, 2006. On December 14, 2006, Bowser-Morner, Inc., the firm responsible for

plaintiff's concrete strength testing, provided a "Report of Concrete Compressive Strength Tests." Some of the initial 28-day test results of the cylinder strengths measured below the 4,000 pounds-per-square-inch (psi) strength specified by the contract.

Plaintiff requested Bowser-Morner perform additional tests using core samples of the actual hardened concrete in the walls of the feed mill. Many of these samples also failed to meet the 28-day specified strength of 4,000 psi.

On February 1, 2007, Andrew Bishop, PSD Development's contact for the feed mill project, asked Younglove's project manager, Kenneth DuBois, for an update on the low-strength concrete issue. DuBois sent Bishop the test results. On February 15,  Bishop sent Younglove a letter informing plaintiff that PSD Development intended to make a claim relating to the low-strength concrete unless the parties could agree on a correction or a contract price adjustment.

Younglove's engineer of record for the feed mill, Douglas Iverson, reevaluated the design of the plant based on the cylinder test results as first reported by Bowser-Morner. On July 2, 2007, Iverson sent his reevaluation to DuBois, who forwarded the letter to Bishop. This reevaluation did not alleviate PSD Development's concerns, and Bishop communicated to DuBois that PSD Development believed that any reevaluation of the design should be based on the core strength test results.

On November 20, 2007, DuBois sent PSD Development a letter with opinions of two engineers on the concrete issue. Iverson wrote the first opinion, stating that the low-strength concrete did not jeopardize the structural integrity of the feed mill. The opinion provided no supporting documentation, analysis, calculations, or explanations.

Jim Ebmeier of Ebmeier Engineering wrote the second opinion, which assessed concrete durability based on the results Younglove sent him. In his opinion, the below-grade concrete did not compromise the durability of the feed mill, though he recommended routine inspections at intervals as frequently as every six months. Ebmeier's letter did not include an analysis of strength issues; it simply noted that the 28-day results were below ACI requirements and that the design engineer is responsible for verifying the adequacy of the design.

On December 20, 2007, Paul Kalmbach, president of Kalmbach Feeds, Inc., and also responsible for operations of PSD Development, sent Younglove president Michael Gunsch a letter with the contact information for engineer Tom Johnston, and indicated that PSD Development had hired Johnston to look into problems with the concrete.

On December 21, 2007, Younglove sent PSD Development a letter stating that construction of the feed mill was substantially completed as of November 1, 2007.

## 2. Past-Due Progress Payments

On December 27, 2007, Younglove sent PSD Development a certified letter requesting payment of past-due invoices from October 2007. Younglove asserted that because PSD Development had not provided immediate notice that it was withholding payment, the contract required immediate payment of the past-due amounts.

Kalmbach replied in a December 31, 2007, letter that "everyone involved knows full well that the reason for not receiving payment is that the defective concrete issue has not been resolved." [Doc. 99, Ex. 9]. Kalmbach explained, "Our purpose is to understand and determine the extent of the defects and that is why we have employed an engineer to address this issue properly." *Id.*

4

Kalmbach made clear that PSD Development would make no further payment until the concrete issues were resolved.

Younglove's claim for the balance due is $1,136,496.00, plus interest. This amount is the sum of six applications for payment [Docs. 97, Ex. 1; 99, Ex. 8]:

| Application Number | Type | Date | Amount |
| --- | --- | --- | --- |
| 17 | Payment | October 3, 2007 | $220,148.00 |
| 18 | Payment | November 5, 2007 | $261,701.00 |
| 19 | Payment | December 4, 2007 | $44,451.00 |
| 20 | Retention | December 4, 2007 | $312,415.00 |
| 21 | Payment | January 8, 2008 | $281,801.00 |
| 22 | Retention | February 5, 2008 | $10,000.00 |

### 3. Contract's Payment Provisions

Article 13 of the contract's General Conditions controls payments and completion of the feed mill:

> 13.02 Application for Progress Payment
>
> A. . . . Design/Builder shall submit to Owner for review an Application for Payment filled out and signed by Design/Builder covering the Work completed as of the date indicated on the Application.
>
> \* \* \* \* \*
>
> C. The amount of retainage with respect to progress payments will be as stipulated in the Agreement.
>
> \* \* \* \* \*
>
> 13.03 Progress Payments
>
> A. Procedure. Progress payments shall be made by the Owner to the Design/Builder according to the following procedure:
>
> > 1. Owner will, within ten days of receipt of each Application for Payment, either indicate in writing its acceptance of the Application and state that the Application is

5

>being processed for payment, or return the Application to Design/Builder indicating in writing its reasons for refusing to accept the Application. Not more than ten days after accepting such Application the amount will become due and when due will be paid by Owner to Design/Builder.
>
> * * * * *
>
>4. No Progress Payment nor any partial or entire use or occupancy of the Project by Owner shall constitute an acceptance of any Work not in accordance with the Contract Documents.
>
> * * * * *
>
>B. Reduction in or Refusal to Make Payment. Owner may refuse to make the whole or any part of any such payment, or because of subsequently discovered evidence or the results of subsequent inspections or tests, nullify any previous payment, to the extent that is reasonably necessary to protect Owner from loss because:
>
>>1. the Construction is defective, or completed Construction has been damaged requiring correction or replacement; or
>>
>> * * * * *
>>
>>4. Owner has actual knowledge of the occurrence of any of the events enumerated in paragraphs 14.02.A; or
>>
>> * * * * *
>>
>>7. There are other items entitling Owner to a set off against the amount for which application is made.
>
>C. If Owner refuses to make payment of the full amount requested by Design/Builder, Owner must give Design/Builder immediate written notice stating the reasons for such action and promptly pay Design/Builder any amount remaining after deduction of the amount withheld. Owner shall promptly pay Design/Builder the amount withheld or any adjustment thereto agreed to when Design/Builder corrects to Owner's satisfaction the reason for such action.

[Doc. 111, App. A-1, at 35-36].

Article 14 controls suspension of work and termination of the contractual relationship. Three types of events trigger PSD Development's right to terminate for cause:

>14.02.A.
>
>>1. Design/Builder's persistent failure to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment . . . ) . . .
>>
>>2. Design/Builder's disregard of Laws or Regulations of any public body having jurisdiction.

>   3. Design/Builder's violation in any substantial way of provisions of the Contract Document.

*Id.* at 38.

Under 14.02.B-C, if PSD Development chose to terminate Younglove after one of these events, it had to give seven day's written notice and allow Younglove the opportunity to "correct its failure to perform and proceed[] to diligently cure such failure within no more than 30 days of receipt of said notice." *Id.*

The other provision relevant to payment is Article 5 of the Agreement, "Payment Procedures," which sets forth the percentage that PSD Development would pay, the percentage it would retain, and timing for payment of the retainage. The Additional Supplementary Conditions amend Article 5, and as amended, Article 5 states:

>   A. Progress Payments; Retainage. Owner shall make progress payments on account of the Contract Price on the basis of Design/Builder's Applications for Payment . . . .
>
>   >   1. Prior to Substantial Completion, progress payments will be made in an amount equal to the percentage indicated below, but, in each case, less the aggregate of payments previously made and less such amounts as Owner may withhold in accordance with paragraph 13.03.B of the General Conditions.
>   >
>   >   >   a. Ninety percent (90%) of the work completed (the balance of 10% being retained) upon successful completion of fifty percent (50%) of the project as determined by the Design/Builder and Owner, the payment amount will be one hundred percent (100%) and there will be additional retainage on account of work completed. Thereby making the accumulated retainage at one hundred percent (100%) construction completion of five percent (5%).
>   >
>   >   * * * * *
>   >
>   >   2. Upon Substantial Completion, Owner shall pay an amount sufficient to increase total payments to Design/Builder to 100 percent of the Contract Price (with the balance being retainage), less such amounts as Owner may withhold in accordance with paragraph 13.03.B of the General Conditions.
>
>   B. Final Payment. Upon final completion and acceptance of the Work in accordance with paragraph 13.08 of the General Conditions, Owner shall pay the remainder of the Contract Price.

*Id*. at 5, 100-101.

Article 13 sets forth procedures for Substantial Completion, Final Inspection, and Final payment:

> 13.05 Substantial Completion
>
> A. When Design/Builder considers the Work ready for its intended use Design/Builder shall notify Owner in writing that the Work is substantially complete (except for items specifically listed by Design/Builder as incomplete) and request that Owner issue a certificate of Substantial Completion. Promptly thereafter, Owner and Design/Builder shall make an inspection of the Work to determine the status of completion. If Owner does not consider the Work substantially complete, Owner will notify Design/Builder in writing giving the reasons therefore. If Owner considers the Work substantially complete, Owner will prepare and deliver to Design/Builder a certificate of Substantial Completion which shall fix the date of Substantial Completion. There shall be attached to the certificate a list of items to be completed or corrected before final payment.
>
> \* \* \* \* \*
>
> 13.07 Final Inspection
>
> A. Upon written notice from Design/Builder that the entire Work … is complete, Owner will make a final inspection with Design/Builder and will notify Design/Builder in writing of all particulars in which this inspection reveals that the Work is incomplete or defective. Design/Builder shall immediately take such measures as are necessary to complete such Work or remedy such deficiencies.
>
> 13.08 Final Payment
>
> A. Application for Payment.
>
> > 1. After Design/Builder has completed all such corrections to the satisfaction of Owner . . . Design/Builder may make application for final payment following the procedure for progress payments.

*Id*. at 36-37.

### 3. Younglove's Motion for Summary Judgment

Younglove filed this breach of contract suit seeking payment for the balance owed on the contract. In its Sealed Motion for Summary Judgment, Younglove seeks "a judgment as a matter of

law in the amount of $1,136,496.00 plus contract interest," asserting that "the only issue is whether PSD Development followed the contract's requirement to hold Younglove's money." [Doc. 97].

Younglove also seeks summary judgment on the breach of contract and breach of warranty claims asserted by PSD Partners, PSD Leasing and Kalmbach Feeds, arguing that none of these entities were parties to the contract.

## Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(c). In deciding a motion for summary judgment, the court must accept the nonmoving party's evidence as true and construe all evidence in the nonmoving party's favor. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 456 (1992).

## Discussion

The construction of a written contract is a matter of law for the court. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978). The primary goal of contract construction is to give effect to the intentions of the contracting parties. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987). Where a contract is clear and unambiguous, the plain language of the contract determines the parties' rights and obligations. *ThorWorks Industries v. E.I. DuPont De Nemours and Co.*, 606 F. Supp. 2d 691, 696 (N.D. Ohio 2008).

### 1. Breach of Contract

To demonstrate a breach of contract, a plaintiff must prove the existence of a contract, plaintiff's performance of his obligation, defendant's breach, and plaintiff's damages or loss. *Doner*

9

*v. Snapp*, 98 Ohio App.3d 597, 600 (1994). The parties do not dispute either the existence of the contract or the amount left unpaid.

### A. Younglove's Performance

Younglove asserts that because the feed mill has indisputably been fully functional since November, 2007, it performed its obligation on the contract. PSD Development disagrees, arguing: 1) Younglove breached the contract by providing defective, low strength concrete; and 2) Younglove breached the payment provisions it seeks to enforce.

### i. Concrete

PSD Development is correct that "[g]enerally, a material breach of contract will entitle a party to stop performance." *Marion Family YMCA v. Hensel*, 178 Ohio App. 3d 140, 142 (2008) (citing *Nious v. Griffen Constr., Inc.*, 2004 WL 1752872 (Ohio Dist. Ct.)). PSD Development has provided substantial evidence regarding its contention that the concrete, as tested per the contract, failed to meet contractual requirements.

Ohio courts define a material breach of a contract as "a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA, supra*, 178 Ohio App. 3d at 142-43 (citing Williston on Contracts, Chapter § 63:3). Whether a material breach has occurred ordinarily is a question of fact. *Ahmed v. University Hospitals Health Care System, Inc.*, 2002 WL 664026, *7 (Ohio App. Ct.); *Rhodes v. Rhodes Indus. Inc.*, 71 Ohio App. 3d 797, 807-808 (1991). It is nevertheless true that "determination of whether non-compliance with the terms of a contract is material, so as to constitute a breach, is a mixed question of fact and law. What was required by

way of contract performance turns on contract interpretation, which is an issue of law." *Gilbert v. Department of Justice*, 334 F.3d 1065, 1071-72 (Fed. Cir. 2003).

When, however, the contract, as in this case, specifically provides for a resolution in the event that contract conditions are not met the court must defer to the parties' agreement. As the Ohio Supreme Court stated in *Ladd v. New York Cent. R. Co.*, 170 Ohio St. 491, 500 (1960):

> [T]he law gives to parties competent to contract the same authority to agree on the course to be pursued in the event of a breach of the contract as it does to enter the contract and if the contract provides conditions to be performed in case of a breach, the conditions must be complied with before damages can be recovered by reason of breach.

*See also Bell Bros. v. Robinson*, 5 Ohio App. 454, 458 (1916) ("This would seem to be an elementary proposition of law and is sustained alike by reason and authority.").

Articles 13 and 14 of the contract's General Conditions anticipate disputes about construction of the feed mill, and prescribe procedures for PSD Development to follow when disputes arise.

Article 13 provides that the owner, as PSD Development did here, "may refuse to make the whole or any part of any" progress payment to "protect Owner from loss because: 1) the Construction is defective . . . [or] 4) Owner has actual knowledge of the occurrence of any of the events enumerated in paragraphs 14.02.A . . . ."[Doc. 111, App. A-1, at 36]. "Events" under 14.02.A include:

> 1. Design/Builder's persistent failure to perform the Work in accordance with the Contract Documents (including, but not limited to, failure to supply sufficient skilled workers or suitable materials or equipment . . . ) . . .
>
> 2. Design/Builder's disregard of Laws or Regulations of any public body having jurisdiction.
>
> 3. Design/Builder's violation in any substantial way of provisions of the Contract Document.

*Id*. at 38.

For its part, PSD Development failed to follow the dictates of the contract's General Conditions for withholding payments, which require "immediate written notice stating the reasons for such action." *Id*. at 36.

This payment structure recognizes the financial burden Younglove undertook in underwriting the costs of materials and labor. Younglove's breach, regardless of its materiality, was within the scope of the contract's anticipated provisions, and therefore cannot excuse PSD Development's non-performance where PSD Development failed to abide by the contract's notice provision.

An express contractual provision governs this type of building dispute. I may not rewrite the contract to excuse a party's non-compliance. *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. Admin. Servs*., 113 Ohio St. 3d 226, 233-234 (2007).

PSD Development accepted Younglove's continue work on the feed mill after it decided, without notice, to make no further payments under the contract.

This fact cuts strongly against PSD Development's material breach argument. "Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages." *Costello v. Lungaro*, 54 F.3d 776, 1995 WL 290249, *2 (6th Cir.) (unpublished disposition) (quoting S *& R Corp. v. Jiffy Lube Intern., Inc*., 968 F.2d 371, 376 (3d Cir. 1992).

PSD Development had the option under the contract to terminate Younglove with seven day's written notice. PSD Development could have withheld payments after notifying Younglove. But PSD Development cannot stop payment without contractually required notice while continuing

12

to benefit from Younglove's work on the contract. *Id*. ("Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.").

Even if Younglove provided under-strength concrete, PSD Development remained obligated to pay progress payments unless and until it provided written notice to Younglove.

### ii. Payment Provisions

PSD Development argues Younglove breached the payment provisions it seeks to enforce, and as such cannot meet a required element of its breach of contract claim. Article 13 sets forth conditions for Substantial Completion under the contract, requiring Younglove to "notify Owner in writing that the Work is substantially complete and request that Owner issue a certificate of Substantial Completion. Promptly thereafter, Owner and Design/Builder shall make an inspection of the Work to determine the status of completion." [Doc. 111, App. A-1, at 36]. Final payment is similarly conditioned on Younglove providing "written notice . . . that the entire Work is complete" and making a final inspection with PSD Development of the facility. *Id.* at 37. After this process, the contract allows Younglove to apply for final payment following the procedure for progress payments.

The record is clear that Younglove did not follow these requirements. Although Younglove is correct that this will not bar its claims as to progress payments, the contract requires the conditions for Substantial Completion and Final Inspection be met before Younglove can apply for payment of retainage or final payments. Article 5 of the Agreement states, "[u]pon Substantial Completion, Owner shall pay an amount sufficient to increase total payments to Design/Builder to 100 percent of the Contract Price (with the balance being retainage)." *Id.* at 5 (emphasis added).

As discussed above, the $1,136,496 Younglove claims in withheld payments is the total of six unpaid payment applications. Application Nos. 20 and 22 are labeled "Retention," and Application No. 21 includes nearly the entire balance of the retainage in its tabulations. [Doc. 99, Ex. 8]. Under the terms of the contract, Younglove cannot apply for the payment of the retainage until it has received certification of Substantial Completion and Final Inspection.

The contract is clear and unambiguous on this point, and so its interpretation is a matter of law. The conditions of certification and Final Inspection needed to be fulfilled before PSD Development could be obligated to make payments on the retainage or a final payment. *Kern v. Clear Creek Oil Co.*, 149 Ohio App. 3d 560, 565 (2002). The parties intended these requirements as conditions precedent in order to protect PSD Development; Younglove's own Reply brief interprets the retainage provisions accordingly. [Doc. 134, at 14] (arguing that the "half million dollars [PSD Development] already had in retainage [may have been] sufficient to address [its] concerns").

A condition precedent requires "that an act must take place before a duty of performance of a promise arises. If the condition is not fulfilled, the parties are excused from performing." *See Kern*, *supra*, 149 Ohio App. 3d at 565. Younglove's belief that PSD Development "would have refused to issue such a certificate in any case," does not change the fact that seeking certification was a condition precedent to applying for retainage payments under the terms of the contract. The same law that requires me to apply the clear and unambiguous terms of the contract to PSD Development's duty to issue written notice requires me to find that Younglove failed to perform a condition precedent. *See ThorWorks Industries*, *supra*, 606 F. Supp. 2d at 696; *Dugan*, *supra*, 113 Ohio St. 3d at 231.

14

Summary judgment should be granted to Younglove for unpaid progress payments for which PSD Development provided no written notice, but Younglove's request for summary judgment is denied as to final payment and payments of retainage.

### B. PSD Development's Breach

It is undisputed that Younglove had actual knowledge of the concrete problem. PSD Development argues that this fact means Younglove had effective notice, and thus PSD Development did not breach any contract provisions. But this argument is unconvincing. As Younglove points out, the critical language of the contract is not notice of Owner's concern, but notice of Owner's refusal to pay. And as PSD Development points out, it continued to make payments for eight months after providing Younglove with written notice of its intent to make a claim. [Doc. 123, at 4]. Younglove therefore had no actual notice of PSD Development's intent to stop making payments, let alone the "immediate written notice" required by the contract.

The record is clear that PSD Development gave Younglove no "immediate written notice" that it was withholding the October and November 2007 progress payments. Accordingly, Younglove is entitled to summary judgment on its breach of contract claim as to those two withheld payments. I find, however, that there is a genuine issue of material fact as to whether the December 31, 2007 letter constituted sufficient notice under the contract for the December 4, 2007 application (Application No. 19).

I note first my disagreement with Younglove's contention that the notice provisions require PSD Development to calculate damages in order to justify withholding payments. The contract instructs PSD Development to "promptly pay Design/Builder any amount remaining after deduction of the amount withheld." [Doc. 111, App. A-1, at 36]. Nothing in this language requires an itemized

15

bill of damages. In fact, paragraph B of the same subsection expressly states that "Owner may refuse to make *the whole* or any part of such payment . . . to the extent that is reasonably necessary to protect Owner from loss." *Id.* (emphasis added).

Because the contract entitles PSD Development to withhold the entire amount of a progress payment in the event of a breach, it required nothing more specific than the December 31, 2007, letter, which stated, "Until we have resolved the defective concrete issue, there will be no further payments." Moreover, in light of the uncertainty of damages and the fact that defendant hired an engineer to address the issue, the amount withheld is not facially unreasonable. Younglove's complaint that PSD Development failed to make "any determination . . . whether the half million dollars they already had in retainage was sufficient to address their concerns," [Doc. 134, at 14], is particularly disingenuous, as the damages it seeks include retainage.

There is a genuine issue of material fact as to whether the December 31, 2007 letter constituted sufficient notice under the contract for the progress payment application dated December 4, 2007 (Application No. 19). Although the contract requires defendant to give "immediate written notice" of refusal to pay "within ten days of receipt" of a progress payment application, the course of the parties' dealings suggests that Younglove may have waived the ten days requirement. Under Ohio law, parties can, by the course of their dealings, waive a contractual provisions if one party "has been prejudicially misled or lulled into believing strict compliance is not required." *Clevenger v. Dillard's Dep't Stores*, 2007 WL 2902933, *26 (S.D. Ohio) (citing *McMillen v. Willys Sales Corp.*, 118 Ohio App. 20, 27 (1962)). PSD Development asserts, and Younglove does not contest, that "payment was often delayed," "PSD paid late on eleven of sixteen pay applications," and "Younglove did not claim any breach on these occasions." [Doc. 123, at 10, n. 7]. I disagree with

16

PSD Development's argument that Younglove's acceptance of late payments constitutes any waiver of the written notice requirement. I accept, however, that there is a question of fact as to whether PSD Development relied on the parties' prior course of action in failing to respond within ten days to the December 4, 2007, payment application. Summary judgment is therefore inappropriate as to defendant's breach of contract regarding Application No. 19.

Having considered each unpaid payment application in Younglove's breach of contract claim, I grant Younglove's motion for summary judgment as to Application Nos. 17 and 18, and deny the motion as to Application Nos. 19, 20, 21, and 22.

### 2. Whether PSD Partners, PSD Leasing or Kalmbach Feeds Are Intended Third-Party Beneficiaries

In Ohio, only a party to a contract or an intended third-party beneficiary may bring an action on the contract. *Maghie & Savage, Inc. v. P.J. Dick, Inc.*, 2009 WL 1263965, *11 (Ohio App. Ct.) (citing *Grant Thornton v. Windsor House, Inc.*, 57 Ohio St. 3d 158, 161 (1991)). It is undisputed that Younglove and PSD Development are the only two parties to the contract. It is undisputed that PSD Partners or PSD Leasing are not intended third-party beneficiaries, and therefore Younglove's Motion for Summary Judgment on the breach of contract and breach of warranty claims asserted by PSD Partners and PSD Leasing is granted. The only question remaining is whether Kalmbach Feeds is an intended third-party beneficiary of the contract.

A third-party beneficiary receives the benefit of a promise made in the contract but is not a party to the contract. *E.g.*, *Visitine & Co. v. New York, Chicago & St. Louis R.R. Co.*, 169 Ohio St. 505, 507 (1959). For the third-party to have enforceable rights under the contract, the promisee must intend that the third-party benefit from the contract. *Perrysburg v. Toledo Edison Co.*, 171 Ohio App. 3d 174, 181 (2007). As long as the third-party is contemplated by the parties to the contract

and identified sufficiently, the third-party need not be named in the contract. *Perrysburg*, *supra*, 171 Ohio App. 3d at 181 (citing *Chitlik v. Allstate Ins. Co.*, 34 Ohio App. 2d 193, 196 (1973)).

Under the "intent to benefit" test, if the promisee intends that the third party should benefit from the contract, then the third party is an intended beneficiary with enforceable rights under the contract. *Norfolk & Western Co. v. U.S.*, 641 F.2d 1201, 1208 (6th Cir. 1980) (applying Ohio law). The "mere conferring of some benefit on the supposed beneficiary by the performance of a particular promise in a contract [is] insufficient; rather, the performance of that promise must also satisfy a duty owed by the promisee to the beneficiary." *Id.*

In Ohio, rules of contract formation dictate that courts look to the plain language of the contract to determine contractual intent. *See*, *e.g.*, *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996) ("The intent of the parties is presumed to reside in the language they choose to use in their agreement."); *Penn Traffic Co., v. AIU Ins. Co.*, 2001 WL 1085242, *10 (Ohio App. Ct.) ("[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties."). I must look to the plain language of the contract to determine whether Kalmbach Feeds has rights under the contract as an intended third party beneficiary.

The Additional Supplementary Conditions of the contract removed Kalmbach Feeds from the contract and replaced it with PSD Development. This fact alone, however, is insufficient to show that "Kalmbach Feeds was NOT someone for whose benefit Younglove's performance was expected." [Doc. 97, at 14]. As discussed above, Ohio law does not require that third-party beneficiaries be expressly named in the contract. *Hines v. Amole*, 4 Ohio App. 3d 263, 268 (1982)

("A third party person for whose benefit a contract is made need not be named therein. It is sufficient if the third person is in the contemplation of the parties.").

In its briefing, Younglove explained that "PSD Development was formed for the purpose of owning the facility and solely owns the real estate and the buildings, but it does not operate the facility or own the equipment in the facility," while "Kalmbach Feeds is the entity that markets and sells the finished product." [Doc. 97, at 14]. The contract's main objective, as Younglove asserts throughout its briefing, was the construction of a "ready-to-operate Feed Manufacturing Plant." [Doc. 97]. There is nothing in the record to indicate that any entity other than Kalmbach Feeds was ever contemplated for operating the feed mill.

In *Bobb Forest Products v. Morbark Industries*, 151 Ohio App. 3d 63, 84 (2002), Bobb Forest Products successfully asserted a claim as a third-party beneficiary, even though it was not a party to the sales contract at issue. The court found that the defendant knew that it was manufacturing a sawmill for Bobb Forest Products' ultimate use, and also knew the other contracting party purchased the sawmill only after ensuring Bobb Forest Products would be purchasing the mill. *Id.* The court found that the defendant knew exactly who the ultimate consumer would be and what Bobb Forest Products' needs and requirements were. *Id.* Because the defendant "produced this specific sawmill for this specific consumer while knowing this specific consumer's needs," Bobb Forest Products was an intended third-party beneficiary. *Id.*

The situation of Kalmbach Feeds appears substantially similar to that of *Bobb Forest Products*. Although PSD Development replaced Kalmbach Feeds as the owner and contracting party, Younglove puts forth no argument that Kalmbach Feeds was not in the contemplation of the parties at the time of contracting or indeed at any point in their relationship. Its own description of the

19

defendants suggests that Younglove and PSD Development were both aware throughout their relationship that Kalmbach Feeds was to operate the finished feed mill.

Kalmbach Feeds is an intended third-party beneficiary of the contract between Younglove and PSD Development. As such, Younglove's Motion for Summary Judgment on the breach of contract and breach of warranty claims asserted against it by Kalmbach Feeds is denied.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT plaintiff's motion for summary judgment [Doc. 97], be, and the same hereby is granted in part and denied in part as provided herein.

So ordered.

s/James G. Carr
United States District Judge