# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Younglove Construction, LLC,                                    Case No. 3:08CV1447

        Plaintiff

        v.                                                            ORDER

PSD Development, LLC, et al.,

        Defendants

    This suit arises out of a "design/build" construction contract. Defendant PSD Development, LLC (PSD Development), an Ohio company, contracted with plaintiff Younglove Construction, LLC (Younglove) to build an animal feed manufacturing facility (feed mill) in Wyandot County, Ohio. Younglove sued PSD Development for breach of contract to recover $1,136,496 in withheld payments. PSD Development counterclaimed, alleging Younglove breached the contract's requirements for concrete strength and placement of concrete reinforcement (rebar). Jurisdiction is proper under 28 U.S.C. § 1332. Ohio law governs the contract.

    Pending is PSD Development's motion [Doc. 106] for partial summary judgment on its breach of contract counterclaims and summary judgment on Count One of Younglove's Amended Complaint. [Doc. 69]. For the following reasons, the motion is granted in part and denied in part.

## Background

    The contract had six main parts: 1) the Agreement; 2) General Conditions; 3) Supplementary Conditions; 4) Design/Build Manual; 5) Design/Builder's Proposal, Specifications, and Project Schedule; and 6) Additional Supplementary Conditions. [Doc. 111, App. A-1]. The contract also incorporated by reference: 1) Notice to Proceed; 2) all work change directives and change orders

amending, modifying or supplementing the contract, pursuant to ¶ 3.04.A of the General Conditions; 3) specifications for the Feed mill prepared by or for Design/Builder and approved by Owner; and 4) drawings showing the scope, extent or character of the Feed mill, prepared by or for Design/Builder and approved by Owner. *Id.* at 6-7.

The contract required Younglove to provide both design and general contracting services for construction of the feed mill. Younglove's design called for construction of a slipform-built, reinforced concrete feed mill with multiple levels of elevating, conveying, weighing and mixing equipment as well as ingredient and feed silos. The main structure contains fifty-eight reinforced concrete silos and multiple equipment floors.

The contract had a start date of not later than August 1, 2006, and required substantial completion within fifteen months. The parties agree that the feed mill was substantially completed on time, but both parties allege the other failed to fulfill its contractual obligations.

### 1. Concrete Strength

Problems surfaced soon after construction of the main mill tower began in mid-November, 2006. On December 14, 2006, Bowser-Morner, Inc., responsible for Younglove's concrete strength testing, provided a "Report of Concrete Compressive Strength Tests." Some of the initial 28-day test results of cylinder strengths measured below the 4,000 psi strength specified by the contract.

Younglove asked Bowser-Morner to do additional tests using core samples of the actual hardened concrete in the walls of the feed mill. On January 24, 2007, Bowser-Morner reported that eight of the eleven cores tested failed to meet ACI acceptance criteria. One core tested as low as 2,300 psi.

2

On February 1, 2007, Andrew Bishop, PSD Development's contact for the feed mill project, asked Younglove's project manager, Kenneth DuBois, for an update on the low-strength concrete issue. DuBois sent Bishop the Bowser-Morner test results.

On February 15,  Bishop sent a telling Younglove that PSD Development intended to make a claim relating to the low-strength concrete unless the parties could agree on a correction or a contract price adjustment.

DuBois requested that Bowser-Morner determine if the concrete mix  (*i.e.*, the amount of cement, water and air) was proper. Bowser-Morner sent the test cores to Dr. David Lankard in Columbus, Ohio, for a petrographic analysis.

Dr. Lankard found no compelling evidence indicating a significant "mix design" violation. He did find compelling evidence that lateral movement in the walls of the structure after the release of the form caused the defects.

On March 16, 2006, Younglove's engineer of record for the feed mill, Douglas Iverson, informed DuBois that "the strength requirement of $f\,'\,c$ [the specified compressive strength of concrete] = 4,000 psi has not been met for this project and the structure will need to be re-evaluated to determine if the load carrying capacity of the structure has been jeopardized." [Doc. 111, App. A-16].

Iverson re-evaluated the design based on the December, 2006, initial core test results from Bowser-Morner.

On July 2, 2007, Iverson sent his reevaluation to DuBois, who forwarded the letter to Bishop. This reevaluation did not alleviate PSD Development's concerns. Bishop communicated to DuBois

3

that PSD Development believed any reevaluation of the design should be based on the core strength test results, not the cylinders initially tested.

Iverson began a re-evaluation of the design based on the core strength test results. He gave DuBois with a preliminary sketch of a potential repair for the low-strength concrete walls in the basement of the feed mill. In response, DuBois asked Iverson to send a "short letter" on the concrete issue to PSD Development.

On November 20, 2007, DuBois sent PSD Development the requested letter. It included opinions from two engineers regarding the concrete strength. Iverson wrote the first opinion, stating that the low-strength concrete did not jeopardize the feed mill's structural integrity. No supporting documentation, analysis, calculations, or explanations accompanied the opinion

Jim Ebmeier of Ebmeier Engineering wrote the second opinion. In it he assessed concrete durability based on the results Younglove sent him. He stated that the below-grade concrete did not compromise the durability of the feed mill, though he recommended routine inspections at intervals as frequently as every six months. Ebmeier's letter did not include an analysis of strength issues.

On December 20, 2007, Paul Kalmbach, who is President of Kalmbach Feeds, Inc., and also was responsible for the operations of PSD Development, sent Younglove President Michael Gunsch a letter stating that PSD Development had hired engineering expert F. Thomas Johnston, P.E., to look into problems with the concrete.

On December 21, 2007, Younglove sent PSD Development a letter stating that construction of the feed mill had been substantially completed as of November 1, 2007.

### 2. Past-Due Progress Payments

4

On December 27, 2007, Younglove sent PSD Development a certified letter requesting payment of past-due invoices from October, 2007. Younglove asserted that because PSD Development had not given immediate notice that it was withholding payment, the contract required immediate payment of past-due amounts.

Kalmbach replied in a December 31, 2007, letter that "everyone involved knows full well that the reason for not receiving payment is that the defective concrete issue has not been resolved." [Doc. 99-9]. Kalmbach explained, "Our purpose is to understand and determine the extent of the defects and that is why we have employed an engineer to address this issue properly." *Id.* Kalmbach made clear that PSD Development would make no further payment until resolution of questions and concerns about the concrete.

### 3. Concrete Reinforcement

Johnston analyzed and evaluated the design and structural integrity of the feed mill for PSD Development. To aid his evaluation, Johnston engaged a specialist in ground penetrating radar, Nate Kollar, to conduct a series of surveys to determine the depth and spacing location of the reinforcement in the concrete walls. Johnston's review of these surveys revealed:

- Younglove did not tie down or secure the reinforcement prior to casting the concrete, but rather appeared to have dropped the reinforcement into the recently cast concrete.[1]

- The concrete cover for the horizontal reinforcement in the interior bin walls varied greatly from ½ inch to 3 inches. The spacing of the horizontal reinforcement in the interior bin walls also varied greatly from 8 inches to 26 inches.

- Several of the horizontal reinforcement bars in Bin 27 had extremely short splice lengths, and some bars had no continuation at all. In addition, survey of the interior

---

[1] Placing reinforcement into poured concrete is called "floating." DuBois testified that Younglove sometimes "floats" concrete.

5

bin wall revealed areas where the average cover on the horizontal reinforcement was 1.97 inches. In addition, one bar in the area had a splice length of approximately 2 inches. The adjacent bar had no continuation reinforcement.

• The survey of the north basement wall revealed covers varying from 1½ inches to 2¾ inches for the horizontal reinforcement. Several horizontal bars were not level, and the spacing varied from 3 inches to 7 inches. Many of the vertical reinforcement bars did not lap the foundation dowels below and several of the vertical bars were not plum but were sloped at an angle from the vertical.

• The concrete cover on the interior east basement wall varied from 1½ inches to 2¾ inches. The spacing of the horizontal reinforcement varied from 2 inches to 7 inches. Several vertical bars tilted substantially from a plum position, and some did not lap the foundation dowels.

• The concrete cover for the horizontal reinforcement on the exterior face of the east wall varied substantially, both between adjacent horizontal bars and along individual bars. The concrete cover for one of the horizontal bars varied from ¾ inches at one location to 1⅞ inches at the outer edge of the pattern.

• The concrete cover for the horizontal reinforcement in the interior basement wall at the south end of Beam M20 exceeded the specified cover on both the north and south sides of the wall. On the north side of the beam, the concrete cover varied from 1½ inches to 3¼ inches. On the south side, the cover varied from 1½ inches to 1⅞ inches. The splice length of one bar at the center of the opening was only 9 inches. The horizontal bar with the insufficient splice lengths is located in the same area as the wide vertical crack at the south end of Beam M20.

*See* [Doc. 111, App. B].

David Johanson, Younglove's project superintendent, acknowledged in a deposition that Younglove floated the reinforcement. He also explained that Younglove did not measure the vertical spacing of the horizontal reinforcement, but rather depended on the amount of concrete placed in the forms at each step of the slip process. As a result, Younglove placed horizontal reinforcement "roughly" every six inches and "probably" not on the level. [Doc. 111, App. A-6, at 79]. Younglove also did not measure the concrete cover. According to Johansen, workers would "just eye it." *Id.* at 139.

6

**4. Contract Requirements**

The contract's "Standard Form of Agreement Between Owner and Design/Builder on the Basis of a Stipulated Price" (Standard Form) § 1.01 requires Younglove to complete the feed mill "as specified or indicated in the Contract Documents."

Section 8.01 of the Standard Form lists the Contract Documents, which include the items attached to the contract and incorporate by reference "[s]pecifications[2] as defined in Paragraph 1.01.A.40 of the General Conditions [and] [d]rawings[3] as defined in Paragraph 1.01.A.18 of the General Conditions."

The contract required Younglove to "give all notices required by and comply with all Laws or Regulations applicable to the performance of the Work." *Id.* at 25.

**A. Concrete Strength**

Younglove's drawings numbered C7-C13 depict the "Slip [or Slipform] Reinforcing Plan." [Doc. 111, App. A-27]. These drawings include "Concrete Notes," which state:

---

[2] Paragraph 1.01.A.40:

> *Specifications* – The part of the Contract Documents prepared by or for Design/Builder and approved by Owner consisting of written technical descriptions of materials, equipment, construction systems, standards and workmanship as applied to the Work and certain administrative details applicable thereto.

[3] Paragraph 1.01.A.18:

> *Drawings* – Those portions of the Contract Documents prepared by or for Design/Builder and approved by Owner consisting of drawings, diagrams, illustrations, schedules and other data which show scope, extent, and character of the Work.

7

Concrete to be furnished in accordance with standard specifications for ready-mixed concrete ASTM C94-89b. Strength to be 4000 psi at 28 days using ultimate stress/design method of strength acceptance.

*Id.*

The Ohio Building Code (OBC) and corresponding industry standard (ACI 318) provide requirements for concrete strength and testing. OBC § 1905.1.3 states that "[u]nless otherwise specified, $f'c$ [the specified compressive strength of concrete] shall be based on 28-day tests. If other than 28 days, test age for $f'c$ shall be as indicated in construction documents." [Doc. 125-9, at 7].

OBC § 1905.6 sets forth the requirements for the investigation of low-strength test results:

1905.6.5.1 Precaution. If any strength test of laboratory-cured cylinders falls below the specified value of $f'c$ . . . steps shall be taken to assure that the load-carrying capacity of the structure is not jeopardized.

1905.6.5.2 Core tests. If the likelihood of low-strength concrete is confirmed and calculations indicate that load-carrying capacity is significantly reduced, tests of core drilled from the area in question in accordance with ASTM C 42 are permitted. In such cases, three cores shall be taken for each strength test that falls below the values given in Section 1905.6.3.3, Item 2.

. . .

1905.6.5.4 Test results. Concrete in an area represented by core tests shall be considered structurally adequate if the average of three cores is equal to at least 85 percent of $f'_c$ and no single core is less than 75 percent of $f'c$. Additional testing of cores extracted from locations represented by erratic core strength results is permitted.

1905.6.5.5 Strength evaluation. If the criteria of Section 1905.6.5.4 are not met and the structural adequacy remains in doubt, the building official is permitted to order a strength evaluation in accordance with ACI 318, Chapter 20, for the questionable portion of the structure, or take other appropriate action.

*Id.* at 7-8.

### B. Steel Reinforcement

8

### i. Design Specifications

The Concrete Notes in the design plans also state specifications for placement of the concrete reinforcement. The note, "1½" O.F. cover. 1" I.F. cover," indicates one and one-half inches of concrete cover of reinforcement on the outside walls and one inch of cover on the inside walls. [Doc. 111, App. A-27].

The plans on the drawings specify fifty levels of horizontal reinforcement at six inch intervals for the lower twenty-five feet of the feed mill. For the rest of the feed mill, the plans call for horizontal reinforcement every twelve inches. The plans specify a "lap length,"[4] which sets forth the minimum amount of overlap of reinforcing steel or rebar. The lap length specified is twenty-six or thirty inches, depending on rebar size.

### ii. Ohio Building Code Requirements

The OBC requirements incorporate the industry specification (ACI 318)[5] regarding installation of rebar.

OBC § 1907.5.1 provides:

Reinforcement . . . shall be accurately placed and adequately supported before concrete is placed, and shall be secured against displacement within tolerances permitted in Section 1907.5.2. Where approved by the registered design professional, embedded items (such as dowels or inserts) that either protrude from precast concrete members or remain exposed for inspection are permitted to be embedded while the concrete is in a plastic state, provided the following conditions are met:

1. Embedded items are not required to be hooked or tied to reinforcement within the concrete.

---

[4] "Lap length," "splice length," and "lap splice length" are interchangeable terms. *See* [Doc. 111, App. A, Tab 7, at 74].

[5] OBC § 1901.2 states: "Structural concrete shall be designed and constructed in accordance with the requirements of this chapter and ACI 318 as amended in section 1908 of this code."

9

> 2. Embedded items are maintained in the correct position while the concrete remains plastic.
> 3. The concrete is properly consolidated around the embedded item.

[Doc. 125-9, at 9].

ACI 318-02 § 7.5.1 prescribes an identical standard for placement of reinforcement. [Doc. 111, App. B-E].

OBC §1907.5.2 and ACI 318-02 § 7.5.2.1 specify a ± ⅜ inch tolerance on depth of reinforcement and a - ⅜ inch minimum tolerance on cover of reinforcement, unless the registered design professional specifies a different tolerance.

### C. General Warranty and Guarantee

Section 6.20 of the General Conditions sets forth Younglove's "General Warranty and Guarantee" for its work:

> A.  Design/Builder warrants and guarantees to Owner that all Construction will be in accordance with the Contract Documents and will not be defective.  .  .  .
> B.  Design/Builder's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute.

[Doc. 111, App. A-1].

Section 6.02.A of the General Conditions spells out Younglove's responsibility to supervise construction of the facility:

> Design/Builder shall supervise, inspect and direct the Construction competently and efficiently, devoting such attention thereto and applying such skills and expertise as may be necessary to provide the Construction in accordance with the Contract Documents. Design/Builder shall be solely responsible for the means, methods, techniques, sequences and procedures of Construction. Design/Builder shall be responsible to see that the completed Construction complies accurately with the Contract Documents and shall keep Owner advised as to the quality and progress of the Construction.

*Id.*

10

Section 101.9 of the General Conditions defines "Construction" as: "The result of performing or furnishing of labor, the furnishing and incorporating of materials and equipment into the Work and the furnishing of services .  .  . and documents, all as required by the Contract Documents."
*Id.*

Section 1.02.2 of the General Conditions defines "Defective Construction:"

The word "defective," when modifying the word "Construction" refers to Construction that is unsatisfactory, faulty, or deficient in that it does not conform to the Contract Documents, or does not meet the requirements of any inspection, reference standard, test or approval referred to in the Contract Documents.

*Id.*

### 4. PSD Development's Motion for Summary Judgment

Younglove began this suit by filing a breach of contract claim seeking payment for the balance owed on the contract. I address its motion for summary judgment [Doc. 97] in a separate opinion.

PSD Development counterclaimed, alleging that Younglove breached the contract and its warranties by providing: 1) defective low-strength concrete; and 2) defective construction in violation of its own design specifications and the OBC with respect to placement of reinforcing steel. PSD Development's pending motion seeks partial summary judgment as to its breach of contract claims. PSD Development also seeks summary judgment on Younglove's breach of contract claim.

### Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P.

11

56(c). The court "must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 157 (6th Cir. 2004). Ultimately, there must be evidence upon which a reasonable jury could find for the nonmoving party. *Meridia Products Liability Litigation v. Abbott Laboratories*, 447 F.3d 861, 866 (6th Cir. 2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### Discussion

Construing a written contract is a matter of law for the court. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978). The primary goal of contract construction is to give effect to the intentions of the contracting parties. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987). Where a contract is clear and unambiguous, the plain language of the contract determines the parties' rights and obligations. *ThorWorks Industries v. E.I. DuPont De Nemours and Co.*, 606 F. Supp. 2d 691, 696 (N.D. Ohio 2008).

### 1. Breach of Contract

To demonstrate a breach of contract, a party must prove: 1)existence of the contract, 2) its own performance of its obligation, 3) the opposing party's breach; and 4) damages or loss. *E.g.*, *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (1994). The parties do not dispute the existence of the contract. Damage issues are not presently before me.

### A. Waiver;

Younglove asserts, and PSD Development does not contest, that PSD Development has, since Younglove ended its work on the project, been using the feed mill as PSD Development had intended. In light of that fact, Younglove claims that PSD Development cannot assert a breach of contract claim.

12

Even if PSD Development's use of the feed mill could constitute acceptance of the work, it would not be a waiver of defective construction claims. Article 13.10 addresses waiver of claims on final payment:

> A. The making and acceptance of final payment will constitute:
>
>> 1. A waiver of all Claims by Owner against Design/Builder, except Claims arising from unsettled Liens, from defective Construction appearing after final inspection pursuant to paragraph 13.07, from failure to comply with the Contract Documents or the terms of any special guarantees specified therein, or from Design/Builder's continuing obligations under the Contract Documents.  .  .  .

[Doc. 111, App. A-1].

Had PSD Development accepted Younglove's performance and tendered all payments, PSD Development would still be entitled to bring suit for defective construction or failure to comply with specifications in the Contract Documents.

Section 16.04 of the General Conditions underscores this fact: "All representations, indemnifications, warranties and guarantees made in, required by or given in accordance with the Contract Documents  .  .  .  will survive final payment, completion and acceptance of the Work and termination or completion of the Contract."  *Id.*

Ohio common law would yield the same result absent these contractual provisions. In *Creith Lumber, Inc. v. Cummins*, 163 Ohio St. 264, 267 (1955), the Ohio Supreme Court found waiver of a final inspection provision "where the owner of a building built for him takes possession of it, knowing or having reason to know that the construction is defective or incomplete." The court held that while the contractor was entitled to recover the amount due under the contract, that amount was subject to deductions for deficiencies. *Id.* PSD Development's use of the feed mill, if it is found to

13

be fully functional, may prevent them from withholding payment justly owed to Younglove, but it does not prevent PSD Development from counterclaiming for construction defects.

### B. PSD Development's Performance

Younglove asserts that PSD Development failed to adhere to the contract's notice and payment provisions, and is precluded from asserting a breach of contract claim. Younglove's argument fails under the contract.

### i. Notice Provisions

Younglove argues that PSD Development failed to comply with the notice requirements of Article 12 of the General Conditions. Article 12 states that, "any Construction is found to be defective" within one year of Substantial Completion, PSD Development must give Younglove written instructions to either: 1) correct such defective construction; or 2) if it has been rejected, remove it.

As discussed in my decision on Younglove's motion for summary judgment filed concurrently, Younglove did not comply with the contract's Substantial Completion requirements. Substantial Completion is a condition precedent to the notice provisions. Because the condition did not take place, PSD Development was excused from performing. *See Kern v. Clear Creek Oil Co.*, 149 Ohio App. 3d 560, 565 (2002).

PSD Development did provide notice of its intent to file a claim pursuant to § 9.03.A of the General Conditions.

Ohio courts have held that "where there is evidence of actual notice, a technical deviation from a contractual notice requirement will not bar the action for breach of contract brought against

14

a party that had actual notice." *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 177 Ohio App. 3d 7, 18 (2008).

The parties may not have followed the exact procedures of § 9.03.B-C, but Younglove had actual notice of PSD Development's complaint. Younglove made efforts to alleviate PSD Development's concerns. The record shows that despite some effort, the parties were unable to resolve issues relating to concrete.

Article 15.01 provides that "Owner and Design/Builder may exercise such right or remedies as either may otherwise have under the Contract Documents or by Laws or Regulations in respect of any dispute." That is precisely what the parties are doing in their suit and countersuit.

Any technical violation of the notice provisions by PSD Development did not "destroy the value or purpose of the contract." *See Hansel v. Creative Concrete & Masonry Constr. Co.*, 149 Ohio App. 3d 53, 56 (2002). PSD Development is not barred from asserting its counterclaim for breach of contract for failure to follow the notice provisions more strictly.

### ii. Payment Provisions

Younglove also asserts that because PSD Development failed to comply with the payment provisions of Article 13, "Younglove is not the one who is in breach of contract." A breach by one party, however, does not signify performance by the other. PSD Development's breach will not prevent its counterclaim. *See Hansel*, *supra*, 148 Ohio App. 3d at 57; *Kersh v. Montgomery Dev. Ctr.*, 35 Ohio App. 3d, 61, 61 (1987).

This case presents nothing novel in Ohio law. In *Goldsmith v. Hand*, 26 Ohio St. 101 (1875), the Ohio Supreme Court addressed a contract dispute in which the contractor completed the

15

construction but the owner did not make final progress payments. The contractor sued the owner for the amount due, and the owner countersued for defective materials and unfinished work.

The court stated,

> We think that where parties have dealt with each other as these parties respectively have in reference to the contract and the mode of its performance, and the owner of the lot has chosen to go into the occupancy and use of the building erected upon it, thereby appropriating to himself the fruits of the contract, he ought, on the plainest principles of justice, to pay for them at the contract price, less such sums for delay, defective work, or inferior materials, etc., as the owner is in equity entitled to have deducted.

26 Ohio St. at 107; *see also e.g.*, *Creith Lumber*, *supra*, 163 Ohio St. at 269; *Berger v. Kelsey*, 1990 WL 26234, *2 (Ohio Ct. App.); *Thermal Master, Inc. v. Greenhill*, 1987 WL 17801, *6 (Ohio Ct. App.); *First National Bank of Akron v. Smith*, 1982 WL 199062, *2 (Ohio Ct. App.); *Murray v. Marbro Builders, Inc.*, 53 Ohio App.2d 1, 3 (1977).

PSD Development did violate the payment provisions, and is required under the contract to make progress payments except where it gave timely notice in accordance with the contract's terms of refusal to pay. PSD Development's breach, however, occurred months after the parties became aware of questions about the concrete, and months after it told Younglove it intended to make a claim for noncompliance with the contract.

PSD Development continues to use the feed mill, and therefore may be liable for breach of contract for the withheld payments if Younglove can show substantial performance. But PSD Development is entitled to counterclaim for damages resulting from Younglove's departures from the contract specifications. *See Creith Lumber*, *supra*, 163 Ohio St. at 269 ("The burden would then be on the defendants to show by way of counterclaim the defects in construction, if any, and the

16

consequent credits to which they were entitled as against the balance remaining unpaid on the contract price.").

### B. Younglove's Breach

Younglove spends much of its opposition arguing that the affidavit of F. Thomas Johnston should be excluded. Because Johnston's affidavit provides a basis for PSD Development's breach of contract claims, Younglove argues that the claims must fail. Younglove filed a separate motion to strike Johnston's affidavit, [Doc. 118], and as I have determined in my decision on that motion [Doc. 219] that Johnston's affidavit is admissible, I need not address these arguments again here.

### i. Concrete Strength

PSD Development asserts that Younglove breached the contract's concrete strength provisions.

Younglove's design plan, which is incorporated into the contract, specified a concrete strength of 4,000 psi at twenty-eight days. Bowser-Morner's initial testing of concrete samples from the job site found a number of samples well below this specified strength. Eight of the eleven cores Bowser-Morner subsequently tested failed to meet the ACI Acceptance Criteria, which requires that the average of the core tests be equal to eighty five percent of the design's specified strength. *See* [Doc. 111, App. A-10].

Younglove argues that PSD Development misinterprets the concrete specifications and that the concrete is not defective.

Younglove asserts that the concrete strength specified is a "design value," not a contract specification. Because it is a design value, Younglove claims that ACI 318 (as adopted in the OBC)

determines whether the concrete is acceptable under the contract, not whether the concrete strength met the 4,000 psi at 28 days requirement.

Accepting Younglove's assertion that the 4000 psi specification is a "design value," nothing in the OBC or the contract indicates that Younglove is not obliged to meet this "design value." The OBC states that the strength of concrete is based on the 28-day test. *E.g.*, OBC § 1905.1.3. This in no way suggests PSD Development's interpretation of the contract is incorrect.

OBC § 1905.6.5.4 provides that "[c]oncrete in an area represented by core tests shall be considered structurally adequate if the average of three cores is equal to at least 85% of $f'c$ and no single core is less than 75% of $f'c$" [Doc. 125-9, at 7]. The parties disagree as to whether testing shows that the concrete meets the requirements of this formula.

Younglove asserts that it performed the requirements of § 1905.6.5, which applies "if the criteria of Section 1905.6.5.4 are not met and the structural adequacy remains in doubt." But "structural adequacy" is not what the contract requires. The contract states that the 28-day strength will be 4,000 psi.

The contract obligates Younglove to abide by laws and regulations without defining construction requirements *via* incorporation of specific laws and regulations. This overriding obligation does not relieve Younglove of its duty to comply with the terms and conditions of the contract.

Younglove argues that the OBC "does not declare the concrete 'defective.'" This is, however, irrelevant because the parties defined  "defective construction" in the contract:

> The word "defective," when modifying the word "Construction" refers to Construction that is unsatisfactory, faulty, or deficient **in that it does not conform to the Contract Documents.  .  .  .**

[Doc. 111, App. A-1] (emphasis added).

Younglove guaranteed in the contract that "all Construction will be in accordance with the Contract Documents" and agreed that its "obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute." *Id.*

Younglove argues that "the mere presence of non-conforming Work . . . is *not* a breach of this contract," [Doc. 125, at 14], but its own express guarantees in the contract establish otherwise. Ohio courts have long recognized that "it is not the province of the courts to relieve parties of improvident contracts," and "unless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement." *Dugan & Meyers Constr. Co., Inc. v. Ohio Dept. Of Admin. Servs.*, 113 Ohio St. 3d 226, 231 (2007) (internal citations omitted).

Younglove may be able to prove that the building is structurally adequate, despite failing to match its "design value." Such showing goes, however, to the materiality of the breach and to damages. It does not negate the breach which occurred when Younglove provided concrete below specification.

### ii. Placement of Rebar

Younglove's design specified the location of concrete reinforcement, vertical spacing between horizontal layers, and amount of concrete cover to be placed on the inside and outside faces of the feed mill walls. Johnston stated his findings that Younglove did not meet these specifications. Younglove contests the admissibility of his findings, but nowhere states that these findings are incorrect. Failure to follow design specifications is a breach of the contract's guarantees and warranty.

19

PSD Development asserts that the variances with the design are the result of Younglove's decision to "float" the rebar in violation of the OBC. Because the contract requires Younglove abide by relevant laws and regulations, this violation would be a further breach of the contract.

Younglove claims that PSD Development relies on the wrong version of the OBC. Younglove asserts that the 2005 OBC allows rebar placement to vary from the engineer's structural drawings if, after review and analysis, engineering judgment warrants such variance.

Younglove cites no provision of the 2005 OBC supporting this assertion. Section 1907.5.2 allows a design professional to specify tolerances for depth and cover that depart from Code; but nothing indicates that this is permissible after the fact. I agree with PSD Development's reading that the provisions for reinforcement in the 2005 and 2007 versions of the OBC are effectively the same.

Younglove also claims that "floating" rebar—the practice of placing the steel reinforcement in the wet cement—does not violate OBC § 1907.5.1, which requires, "reinforcement shall be accurately placed and adequately supported before concrete is placed, and shall be secured against displacement."

I cannot determine on the record before me whether "floating" rebar is a per se violation of the OBC. Younglove's experts assert that this method complies with the OBC's requirements, and PSD Development's expert insists that the OBC requires steel be tied down prior to pouring the concrete.

I can, however, determine that whatever method Younglove used, its rebar placement was not accurate. Johnston found spacing that "varied greatly, from 8" to 26", rather than the 12" specified." [Doc. 111, App. B].

20

Younglove's rebar placement did not meet its own design or to the requirements of the OBC. Younglove breached its contractual duties to abide by all laws and regulations and perform all construction "in accordance with the Contract Documents." [Doc. 111, App. A-1].

### 2. Material Breach and Substantial Performance

PSD Development asserts that Younglove materially breached the contract, and that PSD Development is therefore entitled to summary judgment on Younglove's claim for the balance due on the contract.

In my order granting in part Younglove's motion for summary judgment, I am holding that Younglove is entitled to some of the withheld payments under the terms of the contract, regardless of whether there had been a material breach of the contract.

As to the remainder, PSD Development is correct that a party's breach of a material provision of a contract excuses the other contracting party from further performance as a matter of law. But it is equally true that "default by a party who has substantially performed does not relieve the other party from performance." *Kersh v. Montgomery Dev. Ctr.*, 35 Ohio App.3d 61, 62 (1987). If Younglove materially breached the contract, it cannot sustain its breach of contract claim for the balance due on the contract. If Younglove substantially performed, PSD Development must fulfill its contractual obligations, less any damages due to defects. *E.g.*, *Berger v. Kelsey*, 1990 WL 26234, *2 (Ohio App. Ct.).

Ohio courts define a material breach of a contract as "a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 178 Ohio App. 3d 140, 142-43 (2008) (citing Williston on Contracts, Chapter § 63:3).

21

In *Kersh v. Montgomery Developmental Center*, the Ohio court of appeals adopted the Restatement's test for determining whether a party's breach was material. *Kersh*, *supra*, 35 Ohio App. 3d at 62-63; Restatement of the Law 2d, Contracts (1981) 237, § 241. The considerations for determining whether performance is substantial are the same. *See* Restatement of the Law 2d, Contracts (1981) 237, § 237, cmt. d.

The Restatement sets out five factors to be considered in deciding whether a failure to render performance is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Kersh*, *supra*, 35 Ohio App. 3d at 62-63; Restatement of the Law 2d, Contracts (1981) 237, § 241.

Whether a material breach has occurred ordinarily is a question of fact. *Ahmed v. University Hospitals Health Care System, Inc*., 2002 WL 664026, *7 (Ohio App. Ct.); *Rhodes v. Rhodes Indus. Inc*., 71 Ohio App. 3d 797, 807-808 (1991). The record here illustrates why this determination is properly left to the finder of fact. Younglove asserts that PSD Development received the benefit reasonably expected — a functional feed mill. PSD Development, for its part, alleges that notwithstanding its ability to use the feed mill,  Younglove's breach affects its structural soundness and durability.

Questions about concrete strength and rebar placement and extent of structural defects create genuine issues of material fact. The materiality of Younglove's breaches is for the jury.

22

Even a verdict that Younglove's failure to adhere to the contract's concrete strength and reinforcement requirements did not constitute material breaches would not relieve it entirely of all possible liability. *See Kersh*, *supra*, 35 Ohio App. 3d at 63. If PSD Development proves damages from Younglove's failure strictly to fulfill its contractual obligations, such damages could reduce Younglove's recovery, despite a substantial performance in erecting an operational feed mill. *Berger*, *supra*, 1990 WL 26234 at *2; *Creith Lumber*, *supra*, 163 Ohio St. at 269.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT PSD Development's motion for partial summary judgment on its counterclaim and summary judgment on count one of Younglove's amended complaint, be, and the same hereby is granted with regard to its claims of breach as to tested concrete strength and rebar placement as provided herein.

So ordered.


                                              s/James G. Carr
                                              United States District Judge

23