IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Younglove Construction, LLC,                        Case No. 3:08CV1447

       Plaintiff

       v.                                                 ORDER

PSD Development, LLC, et al.,

       Defendants

This dispute arises out of contract litigation between Younglove Construction, LLC (Younglove) and PSD Development, LLC (PSD). Younglove filed a third-party complaint against subcontractor Custom Agri Systems, Inc. (CAS), and CAS turned to its insurance company, Westfield Insurance Co. (Westfield) to defend and indemnify it in the litigation.

Westfield intervened, seeking a declaratory judgment that it had no duty to defend or indemnify CAS under the terms of its policy. On July 21, 2010, I held that Westfield must defend CAS in the pendant litigation under CAS's insurance contract with Westfield. [Doc. 196]; *Younglove Const., LLC v. PSD Dev., LLC*, 724 F. Supp. 2d 847 (N.D. Ohio 2010).

Jurisdiction is proper under 28 U.S.C. § 1332.[1]

---

[1] Although both CAS and Westfield are Ohio corporations, and thus not diverse, "federal jurisdiction once acquired on the ground of complete diversity of citizenship is unaffected by the subsequent intervention 'of a party whose presence is not essential to a decision of the controversy between the original parties[.]'" *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 66 n.1 (1996) (citing *Wichita R.R. & Light Co. v. Pub. Util. Comm'n of Kan.*, 260 U.S. 48, 54 (1922)).

Here, Westfield's intervention is not essential to the original controversy, so its presence does not eliminate federal jurisdiction over the instant case.

Pending is Westfield's motion for reconsideration [Doc. 214] of my July 21, 2010 decision. For the following reasons, Westfield's motion shall be granted.

### Background

### 1. Underlying Litigation

PSD contracted with Younglove to design and build an animal feed manufacturing plant. CAS worked as a subcontractor for Younglove on the project, designing and constructing a steel grain bin. Around October, 2007, CAS completed the project and the bin began operating. CAS obtained components for the bin from Brock Grain Systems. CAS also subcontracted the design and installation of the bin's cement foundation and discharge openings to Kreitemeyer Silo and the erection of the bin to Jerry O'Conick.

A dispute arose between Younglove and PSD regarding the quality of the materials and the work performed, eventually culminating in the suit and countersuit of this litigation. Younglove filed a third-party complaint against CAS for contribution and indemnity, incorporating by reference the allegations of PSD's counterclaim. CAS filed complaints against its subcontractors, and also demanded that Westfield defend and indemnify it in the litigation.

### 2. Policy Provisions

At all pertinent times, Westfield insured CAS under a commercial general liability (CGL) policy. Under the policy, Westfield must "pay those sums that the insured becomes legally obligated to pay as damages because of [. . .] 'property damages' [. . .] caused by an 'occurrence.'" [Doc. 115-10, at 3].

Several exclusions limit the scope of coverage. Under these provisions, the CGL policy does not apply to:

**b. Contractual Liability**

"[P]roperty damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement

\* \* \*

**j. Damage to Property**

"Property damage" to:
\* \* \*

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your

\* \* \*

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

>    **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
>    This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

[Doc. 115-10, at 4-6].

The Westfield Policy also contains a "Professional Liability Exclusion":

> **1.** This insurance does not apply to . . . "property damage" . . . arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:
>
>    **a.** Providing engineering, architectural or surveying services to others in your capacity as an engineer, architect or surveyor; and
>
>    **b.** Providing, or hiring independent professionals to provide, engineering, architectural or surveying services in connection with construction work you perform.
>
> **2.** Subject to Paragraph **3.** below, professional services include:
>
>    **a.** The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, or drawings and specifications; and
>
>    **b.** Supervisory or inspection activities performed as part of any related architectural or engineering activities.
>
> **3.** Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

[*Id.* at 11].

### 3. PSD's Claims Implicating CAS

PSD's Amended Counterclaim [Doc. 70-1] alleged, *inter alia*, that a grain bin CAS provided under a subcontract with Younglove was defective. Specifically, PSD asserts: 1) "the grain bin was

4

intended to store corn,[2] purchased at optimal pricing, for future use in the feed manufacturing process"; and 2) Younglove knew that the bin would be filled and emptied as often as three times a week.

According to PSD, the design of the bin was defective because the discharge openings are too small to allow discharge of the requisite volume of product. Furthermore, PSD claims that the defectively-designed bin discharge openings caused asymmetrical flow channels, resulting in damage to the top edge and roof of the bin.[3] This damage prevented corn from being stored in the bin and prevented Kalmbach Feeds, the intended beneficiary of the contract, from purchasing corn at optimal seasonal pricing.

PSD has stipulated that it is not seeking lost profits related to feed production and sales of feed. Instead, the sole measure of damages PSD seeks from Younglove in this litigation is the cost of repair or the diminution in the feed manufacturing plant's value to the extent that repair is not economical. [Docs. 248, 220]. PSD also seeks damages related to the bin, claiming losses due to its inability to purchase and store corn during harvest for later resale at a higher price while the bin underwent repairs. PSD asserts that the lost storage claim is "consequential damages." [Doc. 220].

---

[2] Both during the May 11, 2010 phone conference [Doc. 248, at 30] and in its memorandum in response to Westfield's motion for reconsideration [Doc. 220, at 2], PSD asserts that it intended to store wheat—not corn—in the bin. The type of grain is, however, not germane to the pending motion or this order

[3] PSD's complaint alleges that this design flaw, alone or in combination with the improper design and construction of the concrete foundation for the grain bin, caused the damage to the bin itself. [Doc. 70-1, at 12]. PSD has also claimed that Younglove failed to provide training or adequate signage as required under the contract. [Docs. 70-1, 138]. Improper use of the bin could also have caused the damage. [Doc. 93, at 4].

5

**4. Procedural History**

On July 21, 2010, I held that Westfield has a duty to defend CAS in this litigation. [Doc. 196]; *Younglove*, *supra*, 724 F. Supp. 2d at 861. I determined that CAS's policy excluded coverage for breach of contract claims, including PSD's defective construction claims. *Id.* at 853. In reaching this conclusion, I understood that PSD sought consequential damages stemming from such defective construction, and that PSD's allegations implied tort claims. *Id.* at 852 n.5. I found that these claims triggered Westfield's duty to defend under the policy. *Id.* at 853–860.

Westfield filed the pending motion for reconsideration of that order. It claims that new evidence and the changing complexion of the theories and damages sought in this case leave large segments of my July 21, 2010, order unsupported by the evidentiary record. Westfield also asks me to make the order final under Fed. R. Civ. P. 54(b) so that it may appeal the judgment.

**Standard of Review[4]**

"District courts possess the authority and discretion to reconsider and modify interlocutory judgments any time before final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 952 (6th Cir. 2004) (unpublished disposition); *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) ("[E]very order short of a final decree is subject to reopening at the discretion of the district judge."); *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991).

---

[4] CAS asserts that Westfield's motion to reconsider is technically a Fed. R. Civ. P. 59(e) "Motion to Alter or Amend a Judgment," and that the motion was therefore filed out of rule. Westfield is correct, however, that Fed. R. Civ. P. 59(e) (and its twenty-eight-day limit for filing) apply only to final orders. The July 21, 2010, summary judgment order was not a final order.

Three circumstances justify reconsideration of an interlocutory order: 1) when there is "an intervening change of controlling law; 2) new evidence available; or 3) a need to correct a clear error or prevent manifest injustice." *Louisville/Jefferson Co. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, *supra*, 89 Fed. App'x at 952).

A motion for reconsideration gives me a chance to correct my mistakes before the Court of Appeals has to. *E.g.*, *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 451 (1982). However commonplace the filing of such motions may be, motions for reconsideration are "extraordinary in nature and, because they run contrary to finality and repose, should be discouraged." *E.g.*, *Braithwaite v. Dep't of Homeland Sec.*, 2010 WL 1392605, *1 (N.D. Ohio). It is not the function of a motion for reconsideration "either to renew arguments already considered and rejected by a court or to proffer a new legal theory or new evidence to support a prior argument when the legal theory or argument could, with due diligence, have been discovered and offered during the initial consideration of the issue." *Id.*

## Discussion

In the July 21, 2010 order, I ruled that although the CGL policy did not cover claims for defective construction, the policy nonetheless required Westfield to defend CAS in this litigation. My ruling relied on my understanding that some of PSD's claims could be categorized as seeking consequential damages, and may even sound in tort. If so, that triggered Westfield's duty to defend.

Now that PSD's claims regarding the bin supplied by CAS have been defined and new evidence presented on those claims, it is sensible that I reconsider the effect of the policy exclusions in this case.[5]

The law underlying my decision has not changed, and so if any arguable basis for coverage still exists, Westfield has an absolute duty to defend CAS and its motion for reconsideration must fail. *Sharonville v. Am. Emp'r Ins. Co.*, 109 Ohio St. 3d 186, 189 (2006).

### I. My "Rule" re. Motions to Reconsider

CAS refers to my "rule" about motions to reconsider. In light of its reference to a "rule," I wish to try to clarify my attitude towards such motions.

On our court's public website I have posted a narrative description of some "dos and don'ts." My purpose in doing so is simply to give those attorneys who have not appeared before me, or who may not do so regularly, an introduction to some personal idiosyncracies. But those comments are not "rules," and they do not end with "So ordered."

Within that narrative, I try to express how strongly I dislike and disfavor motions to reconsider. Before adopting my current default approach of imposing sanctions where such motions should not have been filed, I tried other, less rigid and harsh approaches. Without effect.

My current practice works better than anything else at reducing unfounded motions for reconsideration.

---

[5] A federal court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Where no dispute exists regarding choice of law, federal courts apply the law of the forum state. *Lulaj v. Wackenhut Corp.*, 512 F.3d 760, 764 (6th Cir. 2008). Here, the parties do not dispute the application of Ohio law, so I apply Ohio law to this case.

Nothing in my case management procedures should discourage the filing of a well-founded and justified motion for reconsideration. Sometimes I overlook something that really matters, or fail to address an argument that, if considered, might change the result. In which case, calling my attention to that fact is both appropriate and desirable.

But motions for reconsideration rarely have such basis. Most often they only express disagreement with my analysis. The proper venue for that lament is the Court of Appeals. There is a cost to making me listen to songs of that sort.

The pending motion is entirely appropriate. The foundation on which my order rested proved in time incapable of bearing the weight of my decision. That being so, I would prefer to clear it away, rather than forcing counsel to ask the Court of Appeals to break out its wrecking ball.

## II. Coverage

Westfield urges reconsideration of my order because new evidence shows that: 1) the damage to the bin resulted from "off-center discharge when unloading the bin caused by improper operating procedures"; and 2) PSD is not seeking the type of consequential damages that formed the basis of my decision.

In my July 21, 2010, order, I recognized that while it is an open question under Ohio law whether a CGL policy covers defective construction claims, the contractual liability exclusion in CAS's policy removes defective construction claims from coverage.

Under Ohio law, however, damages "consequential" to such excluded claims may nonetheless be covered under a CGL policy. *See*, *e.g.*, *Heile*, *supra*, 136 Ohio App. 3d at 353 (observing that CGL policies "generally insure consequential risks that stem from the insured's work"). Because six months ago it appeared that PSD's allegations "imply tort claims," I found that

9

the contractual liability exclusion did not unambiguously remove such consequential damages claims from coverage.

The question therefore is whether it now appears that PSD's claim for damages resulting from the lost grain storage space are "consequential" to the contract claims, or whether the contract liability exclusion removes this claim from coverage.

The contract liability exclusion is a "business risk" exclusion. Business risk exclusions emphasize that CGL policies "are intended to insure against 'the unpredictable, potentially unlimited liability that can result from business accidents,'" *Interstate Props. v. Prasanna Inc.*, 2006 WL 1474235, *9 (Ohio App. Ct. 2006), and "are not intended to insure 'business risks'—risks that are the normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage," *Heile*, *supra*, 136 Ohio App. 3d at 353.

Such exclusions:

> ensure that damage resulting from a contractor's own work is excluded as liability insurance should not be a warranty or performance bond for general contractors. Importantly, business risk exclusions do not defeat an insurer's duty to defend if there are allegations of "collateral" damage, *e.g.*, damage to property other than the insured's property.

*Nat'l Eng'g & Contracting Co. v. U.S. Fidelity & Guar. Co.*, 2004 WL 1103993, *6 (Ohio App. Ct. 2004).

In my July 21, 2010, opinion, I relied on *National Engineering*, *supra*, 2004 WL 1103993, and *Indiana Insurance Co.*, 2002 WL 1770491 (Ohio App. Ct. 2002), in finding that the contractual liability exclusion did not apply to exclude coverage of PSD's consequential damage claims. But PSD's only "consequential damage claim" is the claim for damages resulting from the loss of storage space. This claim sounds in contract, arising from an assumed risk of doing business, and the contractual liability exclusion therefore does apply.

As the court in *Indiana Insurance Co.*, stated, "the underwriting intent is to exclude coverage for the contractor's business risks, but provide coverage for unanticipated consequential damages." 2002 WL 1770491, *3. PSD's claim is not for an unanticipated consequential loss, but rather seeks the benefit of its bargain with Younglove.

The court in *National Engineering* found that similar claims for economic losses were not collateral or consequential damages, explaining that "allegations of plant downtime and use of employees to help repair [damage] are insufficient evidence of collateral damage," and emphasizing that "a commercial liability policy is simply not a performance bond and is not intended to insure the contractor's work performed or work product." 2004 WL 1103993, at *6; *see also Env. Exploration*, *supra*, 2000 WL 1608908, *6 (holding that insurer had no duty to defend where damages alleged, including loss of use, lost profits and replacement costs, all related to defective work, "not to any consequential damages deriving from such work").

Claims for economic losses deriving from defective construction sound in contract. These are not the consequential or collateral damages Ohio courts consider covered by CGL policies. Ohio courts have found coverage under a CGL policy only when defective construction causes damage to other property. *Compare Nat. Eng'g*, *supra*, 2004 WL 1103993; *Erie Ins. Exch. v. Colony Dev. Corp.*, 136 Ohio App. 3d 419 (2000); *and Acme Steak Co., Inc. v. Great Lakes Mech. Co.*, 2000 WL 1506199, *8 (Ohio App. Ct.) *with Heile*, *supra*, 136 Ohio App. 3d at 354; *Royal Plastics, Inc. v. State Auto. Mut. Ins. Co.*, 99 Ohio App. 3d 221 (1994); *Env. Exploration*, *supra*, 2000 WL 1608908.

PSD's claim for lost storage damages are excluded from CAS's policy with Westfield, and do not trigger Westfield's duty to defend. Any liability CAS might face in this litigation derives

11

directly from its subcontract with Younglove, and as such is excluded from coverage by the contract liability exclusion of its CGL policy.

I note that because this opinion resolves all disputed questions between Westfield and CAS, this judgment is final for the purposes of seeking an interlocutory appeal. It is not necessary, therefore, for me to certify my decision for interlocutory appeal.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. Westfield's motion for reconsideration [Doc. 214] be, and the same hereby is granted;

2. The order entered July 21, 2010 [Doc. 196], be, and the same hereby is vacated;

3. Westfield's motion for summary judgment [Doc. 115] be, and the same hereby is granted; and

4. CAS's cross-motion for summary judgment [Doc. 148] be, and the same hereby is denied.

So ordered.

s/James G. Carr
U.S. District Judge