IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Younglove Construction, LLC,                    Case No. 3:08CV1447

    Plaintiff

v.                                              ORDER

PSD Development, LLC, et al.,

    Defendants

    This dispute arises out of contract litigation between Younglove Construction, LLC (Younglove) and PSD Development, LLC (PSD). Younglove filed a complaint against PSD alleging breach of contract, unjust enrichment and foreclosure of its mechanics lien in response to PSD's failure to pay the balance due on the contract. PSD counter-claimed, alleging breach of contract and breach of warranty arising from defective design and construction claims.

    Younglove filed a third-party complaint against subcontractor Custom Agri Systems, Inc. (CAS), seeking indemnification and contribution from CAS in the event PSD succeeds in its defective construction claims.

    Jurisdiction is proper under 28 U.S.C. § 1332.

    Pending are CAS's motion for summary judgment in the third-party action [Doc. 93] and Younglove's cross-motion for summary judgment against PSD [Doc.121]. For the following reasons, both motions are denied.

**Background**

**1. The Feed Manufacturing Plant**

**A. The Contract**

In April, 2006, Younglove and PSD entered into a written contract whereby Younglove would design and build a feed manufacturing plant. The contract between Younglove and PSD included and incorporated by reference several documents, including the General Conditions and the Kalmbach Feeds Design/Build Bid Manual (Manual).

Pursuant to the contract, Younglove agreed to design the feed manufacturing plant to meet the specifications in the Manual. The Manual provided that the capacity of the ingredient batching/mixing system was to be 125 tons per hour. [Doc. 111-1, at 57]. The design called for one silo with a total corn storage of 100,000 bushels. [Doc. 111-1, at 84].

The Manual required Younglove "to provide appropriate signage for identification, safety, operational, and directional purposes." *Id.* at 60. The Manual also stated:

> The Contractor will instruct the Owner's personnel in the proper operation and maintenance of the systems, equipment, and the general facilities which were provided as a part of the work. Instruction should be thorough, complete and performed to the Owner's satisfaction.

*Id.* at 62.

Section 6.19 of the General Conditions provides:

A. Design/Builder shall:

> 1. Provide assistance in connection with the start-up, testing, refining and adjusting of any equipment or system.
>
> 2. Assist Owner in training staff to operate and maintain the Work.
>
> 3. Assist Owner in developing systems and procedures for control of the operation and maintenance of . . . the Work.

*Id.* at 27.

Section 6.20 of the General Conditions sets forth Younglove's "General Warranty and Guarantee" for its work:

> A. Design/Builder warrants and guarantees to Owner that all Construction will be in accordance with the Contract Documents and will not be defective. . . .
> B. Design/Builder's obligation to perform and complete the Work in accordance with the Contract Documents shall be absolute.

*Id.*

Section 1.02.2 of the General Conditions defines "Defective Construction":

> The word "defective," when modifying the word "Construction" refers to Construction that is unsatisfactory, faulty, or deficient in that it does not conform to the Contract Documents, or does not meet the requirements of any inspection, reference standard, test or approval referred to in the Contract Documents.

*Id.* at 15.

### B. The Subcontract

In June 2006, Younglove entered into a subcontract with CAS whereby CAS was to design and build the steel grain bin[1] for the feed manufacturing plant. Pursuant to a change order entered in August, CAS would also provide the concrete foundation and foundation design for the bin.

The subcontract specified that CAS would:

Provide and install the following per your May 18, 2006 proposal:

> 1. 48" diameter x 82'-10" eave corrugated steel silo as designed and supplied to Brock Grain Systems. Bin design as follows:

---

[1] The feed manufacturing plant contains a number of different bins. The bin in question is the 48-foot steel grain bin. This steel grain bin is more accurately a steel silo, along with its component ladders, gates, bin sweep system, and temperature and aeration control equipment. *See*, *e.g.*, Doc. 121-2. CAS in turn subcontracted with Brock Grain Systems for the construction and erection of the steel bin itself.

>> a. To hold a minimum of 130,000 bushels of whole corn;
>> b. To handle loading of corn at a rate of 7,500 bushels per hour;
>> c. To handle unloading of corn on a continual basis at a rate of up to 5,000 bushels per hour.

[Doc. 121-2, at 5].

Pursuant to a change order, CAS also agreed to provide "design and construction (including supply of all materials less fill stone) of silo foundation." *Id.* at 9.

The subcontract's terms provide for indemnity and contribution:

> 16. INDEMNIFICATION. Subcontractor shall defend, indemnify, and hold harmless Owner, Architect/Engineer, and Contractor . . . from and against all claims, damages, loss, and expenses . . . arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease, death, or injury to or destruction of tangible property (other than the Work itself), including the loss of use resulting therefrom, but only to the extent caused or alleged to be caused, in whole or in part, by any negligent act or omission of Subcontractor . . . .
>
> \*   \*   \*
>
> 22. CONTRACT DOCUMENTS. Subcontractor shall be bound to Contractor by the terms of the Subcontract and of the Contract Documents between Owner and Contractor; shall assume toward Contractor all obligations and responsibilities which Contractor, by the Contract Documents, assumes toward Owner; and shall have the benefit of all rights, remedies, and redress against Contractor which Contractor, by the Contract Documents, has against Owner insofar as applicable to this Subcontract, provided that, where any provision of the Contract Documents between Owner and Contractor is inconsistent with any provision of this Subcontract, this Subcontract shall govern.
>
> 23. SETTLEMENT OF DISPUTES BY CONTRACT DOCUMENTS
> 23.A. In the case of any dispute between Subcontractor and Contractor which is attributable to Owner, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to Owner by the terms of the Contract Documents. Subcontractor also agrees to be bound to Contractor to the same extent Contractor is bound to Owner by the final decision of a court of competent jurisdiction, whether or not Subcontractor is a party to such proceedings. If such a dispute is prosecuted or defended by Contractor against Owner under the terms of the Contract Documents or in court action, Subcontractor agrees to furnish all documents, statements, witnesses, and other information required by the Contractor for such purposes.

4

*Id.* at 8.

By mid-October, 2007, the bin was operational. Younglove substantially completed construction of the feed manufacturing plant by November, 2007. PSD has been operating the plant continuously since then.

### 2. Signage and Training

Younglove provided PSD with operator's manuals for all the equipment delivered, including the grain bin. The grain bin operator's manual instructed operators to empty the bin through the center. Doc. 146-1, at 13. If the center plugs, the bin may be emptied from a sump within twenty-five percent of the radius. *Id.* There was no sump within twenty-five percent of the radius on the bin provided to PSD. *Id.* at 16.

The Mill Superintendent, Don Schwenning, testified that neither Younglove nor any of its subcontractors provided training or instruction to PSD personnel. Schwenning acknowledged receiving an email dated January 7, 2008, from Andrew Bishop, PSD Development's contact for the feed manufacturing plant project. The email mentioned that Bishop had discussed with Paul Kalmbach[2] that the grain bin "[s]ystem was designed to transfer through the center opening, and then move to the sides when cleaning out the system. Jim Wilson [a Kalmback Feeds employee] stated that you can only open the sides a very small amount, or the chain will ride up and hit the conveyor lid." *Id.*

Younglove provided one warning label regarding the dangers of off-center unloading of the bin. Where the sign was located on the outside of the bin wall it was too small to be read from the ground.

---

[2] President of Kalmbach Feeds, Inc., and responsible for PSD's operations.

5

### 3. Problems with the Grain Bin

Schwenning testified that the bin's center discharge opening became plugged approximately two weeks after start-up. [Doc. 146-1, at 13]. When the center sump plugged, Schwenning opened the two closest sumps equally to get the corn flowing again. *Id.* These sumps were not within twenty-five percent of center. *Id.* at 16. Schwenning had not read the operator's manual. *Id.* at 14.

Schwenning told the maintenance supervisor of Kambach Feeds, Stan White, of the plugging problem. White and Schwenning drilled a hole in the side of the bin to "poke [the corn] around and get it going again." [Doc. 104-1, at 52-53]. The maintenance department later put an inspection door on the bin. *Id.*

In March, 2008, a maintenance worker noticed damage to the top edge and roof of the bin and brought it to the attention of Schwenning.

PSD hired an expert, F. Thomas Johnston, to determine the cause of the damage. Johnston performed a site inspection and prepared a report on his findings.

Johnston found that the damage could have been caused by either one or a combination of two things: 1) an asymmetric flow of grain resulting from the improper opening of an exterior outlet to unload the bin while the bin was full or nearly full; or 2) differential settlement of the bin foundation. After conducting a second survey of the bin, Johnston ruled out differential settlement of the bin foundation as a cause of the damage.

Johnston also concluded that the damage to the bin was not "horribly significant," and his recommendation for repair was to "fill [the bin] back up and reattach the roof."

PSD repaired the bin and installed a new, larger sump/channel. Since the installation of the new sump, PSD has not experienced problems with unloading the bin.

### 5. Procedural History

During construction of the feed manufacturing plant, a dispute arose between Younglove and PSD regarding the quality of the concrete. PSD stopped making progress payments soon after it began operations at the plant. Younglove sued PSD for breach of contract and unjust enrichment and seeking foreclosure on its mechanics lien. PSD counter-claimed, alleging breach of contract and breach of warranty arising from defective design and construction claims.

PSD's countersuit alleged, in pertinent part:

31. The grain bin itself was defectively designed, as the discharge openings are much too small to accommodate the flow of product needed in the animal feed manufacturing process.

32. The emergency discharge opening for emptying the bin is also defectively designed in light of Younglove's knowledge of the purpose and intended frequency of use of the bin.

\*   \*   \*

34. The uneven settling of the foundation and/or asymmetrical flow channel through the defectively designed bin discharge opening have caused the bin to bend out of shape, which has in turn caused damage to the top edge and roof of the bin.

\*   \*   \*

37. Further, the Contract requires Younglove to provide appropriate signage and warnings of hazards at the Facility.

38. But Younglove failed to provide adequate signage, warnings, and training regarding hazards at the Facility, including without limitation adequate signage and warnings associated with emptying the grain bin via the defectively designed discharge openings.

Younglove filed a third-party complaint against CAS for contribution and indemnity, incorporating by reference the allegations of PSD's counterclaim.

Pending are CAS's motion for summary judgment against Younglove, Doc. 93, and Younglove's cross-motion for summary judgment against PSD.

**Standard of Review**

A party is entitled to summary judgment on motion under Fed. R. Civ. P. 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The movant must initially show the absence of a genuine issue of material fact. *Id.* at 323.

Once the movant meets that initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, I accept the opponent's evidence as true and construe all evidence in the opponent's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered in support of the motion show there is no genuine issue of a material fact. *Celotex*, *supra*, 477 U.S. at 323.

**Discussion**

CAS pursues summary judgment largely by means of a pass-through argument. It alleges that because Younglove is not liable to PSD on the breach of contract and defective construction claims relating to the grain bin, CAS is therefore not liable to Younglove and should be dismissed from the actions. Younglove adopted CAS's arguments in summary judgment against PSD.

Construing a written contract is a matter of law for court adjudication. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St. 2d 241 (1978) (Syllabus ¶ 1). The primary goal of contract construction is to give effect to the intentions of the contracting parties. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St. 3d 130, 132 (1987). Where a contract is clear and unambiguous, the plain language of the contract determines the parties' rights and obligations. *ThorWorks Industries v. E.I. DuPont De Nemours and Co.*, 606 F. Supp. 2d 691, 696 (N.D. Ohio 2008).

To prove a breach of contract under Ohio law, the plaintiff must establish: 1) the existence of a valid contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) damage or loss to the plaintiff. *Res. Title Agency, Inc. v. Morreale Real Estate Servs.*, 314 F. Supp. 2d 763, 769 (N.D. Ohio 2004) (citing *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App. 3d 770, 778 (2003)). A contract is binding only on parties to a contract and those in privity with them.

"Both indemnity and contribution depend upon liability by one or both parties to the original claimant who suffered the original loss. Without such liability, there is no independent right to indemnity or contribution." *Thompson v. Budd Co.*, 199 F.3d 799, 807 (6th Cir. 1999). Thus, CAS is not liable to Younglove unless Younglove is first liable to PSD.

PSD claims that the grain bin was defective in design and construction and Younglove failed to fulfill its contractual obligations to provide training and signage.

### 1. The Defective Design Claims

PSD claims the grain bin was defective for two reasons: 1) the discharge openings were too small to allow product to flow as needed, and 2) the emergency discharge opening for emptying the bin is defectively designed in light of Younglove's knowledge of the purpose and intended frequency of the use of the bin.

9

CAS and Younglove dispute these allegations. They claim PSD has has presented no proof that the grain bin was defectively designed. They point out that PSD's expert, Johnston, has not advanced any opinion about the discharge openings.

PSD responds that an issue of material fact precludes summary judgment because the grain bin does not empty at the rate specified in the subcontract between Younglove and CAS. Pursuant to the subcontract, the grain bin was to have an unloading capacity of 5,000 bushels per hour. PSD asserts that this unloading capacity in the grain bin was necessary for Younglove to meet the Manual's requirement that the feed manufacturing plant's ingredient batching/mixing system have a capacity of 125 tons per hour.

Although the question of the unloading capacity of the grain bin appears to be in dispute, PSD cannot rely on the specifications of the subcontract alone to prove an element of its breach of contract claim against Younglove.[3] The subcontract is not a part of PSD's contract with Younglove. The only provision in the contract PSD points to is the Manual's requirement that the feed manufacturing plant's ingredient batching/mixing system have a capacity of 125 tons per hour.

PSD has not shown any fact tending to prove that an unloading capacity of 5,000 bushels per hour in the grain bin is, as it claims, necessary to meet the capacity requirement of 125 tons per hour. If PSD had shown that the plant's ingredient batching/mixing system failed to reach a capacity of 125 tons per hour, this failure might create a genuine question of material fact as to whether the bin

---

[3] PSD is not pursuing a breach of contract claim against CAS, so the question of whether PSD is a third party beneficiary to the subcontract is not relevant.

was defectively designed. But PSD offers no evidence that the plant's ingredient batching/mixing system does not meet the required capacity.[4]

PSD has, however, shown that the bin clogged frequently, which required retrofitting with a larger gate. This has resolved the flow problem.

While the fact that the bin does not meet the specifications in the subcontract does not create a triable issue of fact as to whether Younglove breached its contract, PSD's evidence about bin clogging creates such issue.

PSD contracted for, and Younglove promised to design and construct a fully-functional feed manufacturing plant. The grain bin is an integral part of the project. On the record before me, I cannot determine whether, as a matter of law, PSD received the benefit of its bargain if the grain bin frequently clogged and was periodically unusable.

In deciding a motion for summary judgment, I must accept the non-moving party's evidence as true and construe all evidence in the non-moving party's favor. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). Because there is a question as to whether bin clogging manifests a design defect, summary judgment is not appropriate on this breach of contract claim.

As Younglove remains potentially liable to PSD, CAS's motion for summary judgment *vis-a-vis* Younglove is denied.

### 2. Lack of Training and Signage

#### A. Training

---

[4] The plant has been operating continuously since 2007. PSD has stipulated that it has no lost profits from Younglove's alleged defective construction. This indicates that the plant operates at its intended 125 tons/hour capacity.

Two provisions of the contract call for training.

First, the Manual states:

The Contractor will instruct the Owner's personnel in the proper operation and maintenance of the systems, equipment, and the general facilities which were provided as a part of the work. Instruction should be thorough, complete and performed to the Owner's satisfaction.

Second, § 6.19 of the General Conditions states:

A. Design/Builder shall:

> 1. Provide assistance in connection with the start-up, testing, refining and adjusting of any equipment or system.
>
> 2. Assist Owner in training staff to operate and maintain the Work.
>
> 3. Assist Owner in developing systems and procedures for control of the operation and maintenance of . . . the Work.

PSD argues that Younglove failed to train PSD personnel regarding use of the bin. But for that lack of training, according to PSD, its employees would not have opened the off-center sumps, thereby causing damage to the bin.

Younglove claims that the Operator's Manual gave PSD all the instruction it needed. Younglove also argues that these training and signage provisions are general in nature, and that "[i]t is obvious to anyone reading the Design-Build Manual that the training provisions are intended to cover the modern, high-tech and new equipment that was being installed in the plant." [Doc. 146, at 9]. Younglove asserts that "if PSD Development did not know how to use something, they had a duty to solicit the training—and they never asked for training on how to unload a corn bin." *Id.*

Where the terms are clear and unambiguous, a court need not go beyond the plain language of the agreement to determine the rights and obligations of the parties. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 53 (1989).

But the words "training" and "instruct" are not definite enough in themselves to determine what exactly the contract required of Younglove.[5] While contract interpretation is a question of law, "[o]nce ambiguity is determined, the meaning of the words used becomes one of fact." *Ohio Historical Soc. v. Gen. Maintenance & Eng'g*, 65 Ohio App. 3d 139, 146 (1989).

To discover the parties' intent regarding these provisions of the contract, it is necessary to consider extrinsic evidence. *See Engineered Polymers Corp. v. Henry A. Selinsky, Inc.*, 2008 WL 257285, at ¶ 17 (Ohio App. Ct.) (quoting *Shifrin v. Forest City Ent., Inc.*, 64 Ohio St. 3d 635, 638 (1992). It may be, as Younglove argues, that as a sophisticated owner, PSD did not expect training on the grain bin.[6] Or it may be, as PSD argues, that the contract required some direct training of PSD's personnel. The meaning of "training" and "instruction" under this contract is a question of fact—as is the question of whether PSD received such training—and is not appropriate for summary judgment.

---

[5] Younglove's argument that the training provisions in the manual are meant only to cover the modern, high-tech and new equipment lacks support in the language of the contract. There is nothing in the manual's training provisions, located in the "Project Management and Procedures" section, to indicate, let alone clearly or obviously, that training is limited to new, high-tech equipment. *See Alexander*, *supra*, 53 Ohio St. 2d at ¶ 2 ("Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.")

[6] Younglove's failure to warn arguments are not well taken. PSD's claims sound in contract, not tort, and the products liability cases cited are irrelevant to this issue.

Younglove argues that regardless of any contractual obligation to train, PSD has not put forth any facts showing that the failure to train caused PSD to unload the bin incorrectly. The PSD employees responsible for improperly unloading the bin have stated, however, that they would have followed proper unloading procedures had they been aware of them. This creates a genuine issue of material fact as to whether failure to train caused improper unloading and resultant damage.

### B. Signage

The Manual required Younglove:

> to provide appropriate signage for identification, safety, operational, and directional purposes. The Design/Builder will prepare a Signage Schedule identifying the type and location for signage and will provide samples of proposed signage material for Owner's review and approval.

[Doc. 111-1, at 60].

PSD asserts that Younglove did not perform these obligations, and argues that Younglove's failure to post appropriate signage "exacerbated the lack of training" and led to the damage to the grain bin.

The record shows that there was one warning sign on the outside of the grain bin wall, and that it could not be read from the ground.

The contract does not specifically define what "appropriate signage" might be. The term is ambiguous, and its meaning becomes a question of fact. *Ohio Historical Soc.*, *supra*, 65 Ohio App. 3d at 146. Whether Younglove provided inadequate signage is a genuine issue of material fact, as is whether, if so, inadequate signing caused or contributed to the damage to the grain bin. This claim is inappropriate for summary judgment.

### Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT Younglove's motion for summary judgment [Doc. 121], be, and the same hereby is denied. Accordingly, it is ordered that CAS's motion for summary judgment [Doc. 93], be, and the same hereby is denied.

So ordered.

s/James G. Carr
U.S. District Judge
