IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Younglove Construction, LLC,  Case No. 3:08CV1447

    Plaintiff

    v.  ORDER

PSD Development, LLC, et al.,

    Defendants

This suit arises out of a "design/build" construction contract. Defendant PSD Development, LLC (PSD) contracted with plaintiff Younglove Construction, LLC (Younglove) to build an animal feed manufacturing plant. Younglove filed a complaint against PSD alleging breach of contract, unjust enrichment and foreclosure of its mechanics lien in response to PSD's failure to pay the balance due on the contract. PSD counterclaimed, alleging breach of contract and warranties based on construction defects.

Jurisdiction is proper under 28 U.S.C. § 1332.

Pending is Younglove's motion to exclude certain testimony of PSD's expert Jeffrey Pelegrin. [Doc. 265]. For the following reasons, this motion is granted in part.

**Background**

In April 2006, Younglove entered into a contract with PSD. Under this contract, Younglove agreed to design and construct an animal feed manufacturing plant for PSD.

Disputes arose regarding the quality of the materials and workmanship. These disputes have led to this litigation.

PSD retained Mr. Pelegrin to determine the diminution in value of the feed mill resulting from the alleged design and construction defects.

Mr. Pelegrin is an industrial and commercial real estate appraiser with over twenty-five years of experience with industrial and commercial real estate appraisal and financial analysis. He earned a Bachelor of Business Administration in real estate and urban land economics and a Master of Science in real estate appraisal and financial analysis, both from the University of Wisconsin. He is licensed to perform real estate appraisals in Ohio and nine other states nationwide.

In the past twenty-five years, he has completed over 500 hours of real estate appraisal continuing education. He holds the MAI designation conferred by the Appraisal Institute and the FRICS designation conferred by the Royal Institute of Chartered Surveyors. He has appraised thousands of real estate properties, including office space, industrial, retail and residential properties, air space, museums, railroad right-of-ways and feed mills.

Mr. Pelegrin has, however, no experience estimating the diminution of fair market value of property due to construction defects.

Mr. Pelegrin considered several methods of determining the effect of the construction defects on the property. A common appraisal method—comparison of the fair market value of "comparables" on the basis of sales transactions—was not available, as neither party has found sales involving other feed mills with similar design and construction problems. Likewise, attempting to measure the effect on the estimated useful lives of the assets proved not to produce reasonably accurate results.

Mr. Pelegrin researched and analyzed other court cases and published articles addressing how these issues have been handled in valuation.

In light of his inability to generate information on which to base his opinions from conventional sources, Mr. Pelegrin premised his opinions as to the loss of value to PSD by analogizing the circumstances here to those involved in appraising the effects on property values from environmental contamination.

One of the effects of contamination, even after remediation, is the "stigma" associated with even putatively "clean" land. Thus, "market stigma" within the context of environmental contamination recognizes diminution in the fair market value of real property caused by reaction to the fact of past contamination. Pelegrin Report [Doc. 265-2, 49-50]; *see Ferrell v. Lane Residential, Inc.*, 2006 WL 3371461, *6 (N.Y. Sup. Ct. 2006).

To try to develop additional data in the face of what, for him, at least, was a novel task, Mr. Pelegrin supervised and conducted interviews of fifteen real estate processionals and market participants to determine how they would react to the facts and circumstances of this case. His methodology involved calls by Mr. Pelegrin and members of his staff to those individuals. The caller described the construction defects.

Believing the stigmatizing effects of the irreparable construction defects to be similar to those of remediated contamination, Mr. Pelegrin and the other callers included "stigma" as one of the subjects of their inquiry.

The callers did not use a script or standard set of questions. They did not record the calls; instead, they made handwritten note about their conversations.

Mr. Pelegrin also considered the report of F. Thomas Johnston, PSD's retained engineering expert. He used Mr. Johnston's report to identify the estimated cost of repairs, and he discounted these costs against the value of the feed mill. During their survey, the callers used information from

3

Mr. Johnston's report to describe the construction defects to obtain responses as to how the called persons would value the property.

Mr. Pelegrin did not receive the expert reports of Dr. Basham or Mr. Ebmeier, Younglove's retained experts, until after completing the telephone survey. He explained his decision to rely solely on Mr. Johnson's report:

> I determined that the Basham and Ebmeier reports were not as supported and reliable as the Johnston studies. In addition, the Court subsequently ruled with much heavier weighting on the Johnston study. Therefore, even if I had the Basham and Ebmeier reports at the time of the market interviews, I would still have relied on the Johnston report in forming my opinions.

Decl. of Jeffrey G. Pelegrin [Doc. 278-1, at 6].

The results of Mr. Pelegrin's interviews "indicated a range in reduction of value for incurable deterioration and stigma of 10% to 50%, with a central tendency in the 25% to 35% range." Pelegrin Report [Doc. 265-2, at 46]. Mr. Pelegrin relied on the sale of an apartment building needing repairs to its foundation and plumbing system to set a floor of 7.2% adjustment for stigma. Because Mr. Pelegrin considered the construction defects to be pervasive and severe, he determined that "a discount toward the high end of the range is considered reasonable." *Id.* He concluded that there is a 25% reduction in value for known incurable defects and a 10% discount in value for unforeseen defects and stigma. He states that the sales indicated and the discussions with market participants support his conclusions.

## Discussion

Younglove's motion to exclude portions of Mr. Pelegrin's anticipated testimony asserts: 1) Ohio law does not allow damages for stigma; and 2) Mr. Pelegrin's testimony relating to the 35%

4

valuation reduction should be excluded under Fed. R. Evid. 702 as speculative and the product of an unreliable methodology.

## A. "Stigma" Damages Under Ohio Law

Generally, parties injured by a breach of contract are entitled to their expectation interest. *Rasnick v. Tubbs*, 126 Ohio App. 3d 431, 437 (1998) (citing Restatement of the Law 2d, Contracts (1981) 102-103, § 344).

In determining damages for breach of contract in construction cases, Ohio law follows the Restatement (Second) of Contracts § 348(2) (1981):

> If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, [the injured party] may recover damages based on
>
> (a) the diminution in the market price of the property caused by the breach, or
>
> (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

*See*, *e.g.*, *Ohio Valley Bank v. Copley*, 121 Ohio App. 3d 197, 210 (1997) ("[I]f reconstruction and completion will involve unreasonable economic waste, damages are measured by the difference between the market value that the structure contracted for would have had and that of the imperfect structure received by the plaintiff.").

PSD contends that repairs to the property cannot remedy all construction defects, and therefore diminution in value is an appropriate measure of damages.

Mr. Pelegrin asserts that calculating stigma is a standard part of this type of real estate appraisal. Use of facts on which experts in real estate appraisal generally rely does not, however, entirely pave the way for admitting the resulting opinions. Those opinions must still fit the facts at issue and cannot be speculative. *See*, *e.g.*, *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.

3d 26, 30 (1985) (citing Restatement of the Law 2d, Contracts (1981) § 352) ("An injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty.").[1]

Mr. Pelegrin's calculation of the ten percent reduction for stigma is not based on the alleged damage or construction defects (these costs are incorporated into the repair estimate and the twenty-five percent reduction for "known incurable defects"), but rather on unknowns. Pelegrin Depo. at 165 ("The stigma portion of this would be things that they don't know.").

Ohio law does not, however, recognize such stigma damages. *Ramirez v. Akzo Nobel Coatings, Inc.*, 153 Ohio App. 3d 115, 120 (2003) ("[T]his court finds that stigma damages are not available in the state of Ohio."); *see also Chance v. BP Chemicals, Inc.*, 77 Ohio St. 3d 17, 27 (1996) ("We find that the trial court did not abuse its discretion in the circumstances of this case in foreclosing appellants from presenting evidence of speculative stigma damages.").[2]

---

[1] Proving damages for breach of a contract requires greater certainty than in the proof of damages for a tort. *Kinetico*, *supra*, 19 Ohio App. 3d at 30; *Hacker v. Mail*, 1996 WL 346628, n.5 (Ohio App. Ct. 1996) (comparing Rest. 2d Contracts § 352 (1981) with Rest. 2d Torts § 912 (1979)); 22 Am. Jur. 2d Damages § 484 (1988).

For this reason, among others discussed *infra*, PSD's reliance on environmental contamination cases is misplaced.

[2] Ohio thus has not adopted the view of some other courts, and represented by *Ferrell v. Lane Residential, Inc.*, 2006 WL 3371461, *6 (N.Y. Sup. Ct.) (citing *Putnam v. State of New York*, 223 A.D.2d 872 (1996)), in which the court observed:
> The principal of "market stigma" is typically discussed within the context of environmental contamination, but recognizes generally that damages may be proper for the diminution in the fair market value of real property caused by fear of past contamination-or as here past construction defects-even after said defects are corrected. However, market stigma is a recoverable element of damages only if the plaintiff can demonstrate that repairing the damage will not restore the property to its original market.

6

The stigma damages Mr. Pelegrin would testify to, those diminutions in valuation for unknown or possible undiscovered defects beyond even those damages alleged, cannot be shown with reasonable certainty.

PSD argues that a party may recover stigma damages where the party also proves actual damages. Interpreting the Supreme Court of Ohio's decision in *Chance*, *supra*, 77 Ohio St. 3d at 27, Ohio courts have denied recovery for stigma damages representing a decrease in property value "due solely to public perception or fear," and have required that a plaintiff "must show actual harm." *Ramirez*, *supra*, 153 Ohio App. 3d at 119.

PSD asserts that the ten percent stigma figure is also derived from the actual damages in this case. Mr. Pelegrin testified in deposition that "Stigma is in part based on things they don't know about and part based on the fact that they don't know if the fixes are going to cure the problem." Pelegrin Dep. at 166. Ohio courts have not addressed whether a party may recover for stigma directly related to partial repairs such as those contemplated in this case.

Mr. Pelegrin's proposed testimony, however, also includes "things they don't know about." This type of stigma damages falls squarely into the category prohibited by Ohio courts. Mr. Pelegrin's testimony on the issue of unknown damages and stigma shall therefore be excluded.

### B. Admissibility under Fed. R. Evid. 702

Younglove does not question Mr. Pelegrin's qualification as an expert, but rather asserts that he has failed to reliably apply acceptable principles and methods to reach his opinion. Younglove challenges Mr. Pelegrin's method as unscientific and argues that Mr. Pelegrin's failure to consider the reports of Younglove's experts renders his conclusions unreliable. Younglove also argues that his conclusions themselves are unsupported and speculative.

### 1. Standard of Review

Federal Rule of Evidence 702 provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of this case.

An expert's opinion must be "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

In rulings on the admissibility of expert opinion evidence, a trial court has broad discretion. *See Tamraz*, *supra*, 620 F.3d at 672 ("[W]here one person sees speculation, we acknowledge, another may see knowledge, which is why the district court enjoys broad discretion over where to draw the line.").

### 2. Principles and Methods

Younglove argues that because Mr. Pelegrin does not have experience in valuating a feed mill with construction defects, he cannot rely on experience to justify his methodology.

While it is true that Mr. Pelegrin has no experience in appraising the effect of construction defects in an industrial facility, he has extensive experience in appraising generally, including conducting appraisals of unique properties such as museums and airspace. If the his method is

reliable and relevant, there is no reason to exclude the testimony under Rule 702.[3] *See Cayuga Indian Nation of N.Y. v. Pataki*, 83 F. Supp. 2d 318, 328 (N.D.N.Y. 2000).

Mr. Pelegrin considered other methods of determining the loss of value, including measuring the effect on the useful lives of the assets and identifying sales of comparable buildings. Both of these methods are standard in the industry, but they proved unworkable due to the extent of the defects and the uniqueness of the situation. Mr. Pelegrin therefore adopted a method he believed most workable in light of his experience and the unique circumstances of this case.

This method included researching published articles and court cases addressing the effects of construction defects in valuation, drawing comparisons from cases of environmental contamination, and interviewing fifteen market participants for their reactions to the facts of this case.

Younglove challenges the reliability of Mr. Pelegrin's methods because he relied solely on the report of PSD's expert Mr. Johnston to conduct the telephone survey and calculate loss of value.

Mr. Pelegrin did not receive the reports of Younglove's experts Dr. Basham or Mr. Ebmeier before beginning his survey and evaluation. Even after receiving the reports, he chose not to incorporate them in his analysis, relying instead solely on Mr. Johnston's opinion of the construction defects and estimations of repair.

Mr. Pelegrin justified his decision to ignore the reports of Dr. Basham and Mr. Ebmeier by explaining that he "determined that the Basham and Ebmeier reports were not as supported and

---

[3] To hold otherwise would be akin to ignoring *Daubert* in favor of the general acceptance test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

9

reliable as the Johnston studies" and that he read my rulings as giving more weight to the Johnston study. Pelegrin Decl. [Doc. 278-1, at 6].

Mr. Pelegrin is not qualified as an expert in engineering or construction costs. His *ipse dixit* on the relative reliability of these reports is therefore problematic.[4]  Furthermore, my prior rulings do not reflect a judgment on the merits of these experts' reports. The weight given any evidence reflects the appropriate standard of review—which in summary judgment motions requires me to "view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga County Probate Court,* 392 F.3d 151, 157 (6th Cir. 2004).

Mr. Pelegrin's reliance on the Johnston study alone and his rationale for doing so are flawed. But "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

This general rule also applies to Younglove's objections relating to the interviews. PSD is correct that courts routinely accept testimony of appraisers based in part on such informal sources. "Commercial real estate is not a branch of social science. Accordingly, in ruling on the admissibility

---

[4] The very research that Mr. Pelegrin relied on in devising his valuation approach advises a different approach. In his article *Post-Repair Diminution in Value from Geotechnical Problems*, Michael V. Sanders, MAI, SRA, explained:

> Estimating the cost to repair is well beyond the expertise of most appraisers. A qualified engineer . . . will generally determine the nature of the problem and design an appropriate fix. Cost estimates might be provided by the engineer, but are more frequently obtained from specialized contractors experienced in the type of work involved.
> While lacking technical expertise in this field, an appraiser should nonetheless familiarize himself or herself with the issues involved. This is particularly true if opposing sides in litigation recommend different remedies (with different costs). . . . [M]aterial discrepancies between opposing sides should be reconciled if possible.

of an appraisal expert's opinions, the court need not apply the same standards of methodological rigor required of social scientific inquiry." *Hawthorne Partners v. AT&T Technologies, Inc.*, 1993 WL 311916, *4 (N.D. Ill.).[5]

Younglove responds that an appraiser's opinion must still arise from reliable methodology. It points to two decisions excluding appraisal testimony based on unreliable surveys, *Player v. Motiva Enterprises, LLC*, 240 Fed. Appx. 513, 516–17 (3d Cir. 2007), and *MSC, LLC v. Transmontiagne, Inc.*, 2009 WL 248023 (W.D. Ark.). Younglove argues that the same outcome is appropriate here because Mr. Pelegrin's survey methods lack any scientific validity.

In *Player* the appraiser determined that contaminated properties had a sixty-six percent loss in value "because, in addition to stigma, there would be a loss in value due to the lack of financing option available to potential buyers." 240 Fed. Appx. at 517. The appraiser based his determination that there would be a lack of financing options on a survey he sent to thirteen lenders (though he received a response from only six lenders, one of whom refused to comment). This survey consisted of a loaded question "fashioned, it seems, to get the negative answer his clients hoped for." *Id.* at 517 n.2.

The district court concluded that "the reliability of the 66% figure is entirely invalidated by the overemphasis placed on the four responses to the email hypothetical, the misleading implication in the email hypothetical, suggesting a much greater contamination of the property than actually

---

[5] Moreover, Rule 703 of the Federal Rules of Evidence states that if facts or data are the type that are "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." *See Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1132 (D. Colo. 2006) ("Market research that includes interviews with market participants is a common component of a study regarding valuation of an environmentally impaired property, [. . .] and so the results of these interviews are 'of a type reasonably relied upon by experts' in this field.").

11

present, and the unclear calculations and assumptions underlying McDonald's arrival at 66%." *Id.* at 517. The Third Circuit upheld the district court's judgment, noting that the appraiser substantially based his conclusions on faulty survey. *Id.* at 520.

Similarly, in *MSC*, the district court excluded the appraiser's testimony on stigma, finding his methodology—which consisted solely of questioning five lenders about whether they would be likely to grant a loan to a purchaser of the property"—to be unreliable.

Although Mr. Pelegrin's interview method is far from unassailable, it is not so obviously unreliable as those in the cases Younglove cites. While Mr. Pelegrin gave the discussions "significant weight" in his conclusion, [Doc. 265-2, at 53], he also considered published articles, legal decisions, and sales of properties with construction defects and environmental contamination.

Other courts have noted the importance of "proceed[ing] cautiously before removing from the [fact finder's] consideration expert assessments of value which may prove helpful [because] [s]uch objections generally go to the weight rather than the admissibility of the testimony." *Vector Pipeline, L.P. v. 68.55 Acres of Land*, 157 F. Supp. 2d 949, 957 (N.D. Ill. 2001) (internal quotations omitted).

Younglove's criticisms of Mr. Pelegrin's market interviews go to weight, rather than admissibility. To be sure, expert testimony can mislead. That is a common danger.

But where an expert's opinions pass the *Daubert* threshold, "juror common sense, cross-examination, argument by the party-opponent's attorneys, the testimony of the party-opponent's own expert witnesses, and a cautionary instruction from the Court, if required, will normally assure that the jury fairly evaluates the expert's testimony." *Conde v. Velsicol Chemical Corp.*, 804 F. Supp. 972, 986 (S.D. Ohio 1992).

A unique professional challenge confronted Mr. Pelegrin. For all its objections, Younglove has not shown how he might better have met that challenge. It is for the jury to determine whether Mr. Pelegrin's sources and methods pass the ultimate test of reliability and probative value.

### 3. Application of Principles and Methods

Although I find that the method and sources of data selected by Mr. Pelegrin do not require the exclusion of his testimony under Rule 702, his ultimate conclusions are more problematic. After reviewing the data and noting that "interviews with market participants indicated a range in reduction of value for incurable deterioration and stigma of 10% to 50%, with a central tendency in the 25% to 35% range," Mr. Pelegrin stated:

> Considering the severity and pervasiveness of the defects, a discount toward the high end of the range is considered reasonable. Therefore, the discount for known incurable defects is concluded to be 25%. The discount for unforeseen defects and stigma is concluded to be 10%, which is supported by the sales indicated, as well as through discussions with market participants.

[Doc. 265-2, at 53].

Mr. Pelegrin does not explain how he came to the relative figures of twenty-five and ten percent for known incurable defects and stigma, nor how the data on which he relied distinguished between these two reductions or justified a discount toward the high end of the range.

I have already concluded that Ohio law necessitates exclusion of testimony as to stigma damages. Even if Ohio law allowed stigma damages, too many unknowns make Mr. Pelegrin's opinion as to stigma loss too speculative to be admitted.

Moreover, if, as presently anticipated, production at the feed mill meets PSD's expectations under its contract with Younglove, stigma damage is likely to diminish over time. The longer the

13

mill remains in full and unimpeded operation, the less concern a prospective purchaser is likely to have about hidden, unremediated construction defects.

With regard to the twenty-five percent discount for known incurable defects, Mr. Pelegrin's decision to choose "a discount toward the high end of the range" exposes his conclusions to challenge and doubt. But I find, in light of his experience, especially in dealing extensively with conventional commercial appraisals and, on occasion, appraisals as unique in their own way as this one, the jury should hear what he has to say. His phone survey may appear unusual, but he has explained why he chose that method to find out what he could. Younglove can expose its possible defects on cross-examination, and the jury will give his opinions the weight it believes they deserve.

This case demonstrates how as the unique qualitites of a particular property increase and the number of possible "comparables" decreases, the reliability of an appraisal will be subject to increasing question. But rational people rely on such appraisals in making commercial decisions. A court should not be too quick to reject an appraiser's opinion—where the appraiser is experienced and competent, as Pelegin is—simply because the circumstances are unique.

I conclude, accordingly, that Mr. Pelegrin's opinion as to the effect of incurable defects is neither speculative nor otherwise subject to exclusion.

## Conclusion

For the foregoing reasons, it is hereby:

ORDERED THAT Younglove's motion to exclude certain testimony of Jeffrey Pelegrin [Doc. 265] be, and the same hereby is granted in part and denied in part.

So ordered.

/s/James G. Carr
U.S. District Judge